**APPLEY BROTHERS, et al., Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**UNITED STATES of America, Plaintiff,**

**v.**

**TRANSAMERICA INSURANCE CO., Defendant.**

**Civ. Nos. 92–4037, 92–4110.**

United States District Court,
D. South Dakota,
Southern Division.

April 12, 1996.

John J. Ulrich, U.S. Attorney's Office, Sioux Falls, SD, Bertha R. Mitrani, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, Peter Bonner, Internation-

**948**

al Affairs, Department of Agriculture, Office of General Counsel, Washington, DC, for U.S.

James M. Cremer, Bantz, Gosch, Cremer, Peterson & Sommers, Aberdeen, SD, for Transamerica Insurance.

Jonathan K. VanPatten, Vermillion, SD, for Appley Brothers.

Glenn L. Roth, Freeman, SD, for Kaylor Grain Co., Inc.

## MEMORANDUM OPINION AND ORDER

PIERSOL, District Judge.

Plaintiffs[1] bring this suit for damages, CIV 92–4037, against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680. Before the Court for ruling are the government's Motion to Dismiss or, Alternatively, For Summary Judgment and plaintiffs' Motion for Partial Summary Judgment on liability. For the reasons discussed below, the Court denies the government's motion for summary judgment and grants plaintiffs' motion for partial summary judgment on the issue of liability.

Plaintiffs brought this action in 1992. The government moved to dismiss the complaint as barred by the discretionary function exception, 28 U.S.C. § 2680(a), and by the misrepresentation exception, 28 U.S.C. § 2680(h). The limited record before Judge John B. Jones at that time consisted of the facts as alleged in the complaint and one page from the Grain Warehouse Examiner's Handbook, published by the Warehouse Division of the United States Department of Agriculture (USDA). Taking the alleged facts in the complaint as true, Judge Jones granted the motion to dismiss as to both statutory exceptions. On appeal, a panel of the Eighth Circuit reversed, one judge dissenting, holding that neither exception applied. *Appley Brothers v. United States*, 7 F.3d 720 (8th Cir.1993).

As to the discretionary function exception, the circuit court ruled that an agency poli-cy, set out in the one page exhibit from the Grain Warehouse Examiner's handbook, required the warehouse examiner to take certain actions during an August 5, 1988 inspection of Bird Grain Elevator, and this requirement stripped the examiner of discretion to decide what actions to take during the inspection. *Id.* at 725. The court held that the warehouse examiner failed to follow the agency policy and that he violated the agency's own stated purpose for the August 1988 inspection. *Id.* Consequently, the court ruled that the discretionary function exception did not apply and remanded the case for further proceedings.

■ The parties have now litigated the facts underlying the complaint, and the government again moves to dismiss or for summary judgment based upon the discretionary function exception and on the legal merits of plaintiffs' claims. Plaintiffs argue that the Eighth Circuit's decision is the law of the case with respect to the applicability of the discretionary function exception, (Doc. 74 at 23), but they acknowledge that the law of the case doctrine "does not prevent the United States from litigating the factual predicate upon which *Appley Brothers* was based[,]" citing *Peterson v. City of Plymouth,* 60 F.3d 469, 473 (8th Cir.1995) (holding that law of case doctrine was not strictly applicable on remand following qualified immunity appeal where police officers offered evidence at trial disputing version of events upon which Eighth Circuit's holdings were based). The government argues that the law of the case doctrine does not apply because it has now produced evidence that is substantially different than the facts alleged in the complaint, citing *In re Progressive Farmers Ass'n,* 829 F.2d 651, 655 (8th Cir.1987) (observing that " '[t]he law of the case' doctrine generally requires that a decision on a former appeal be followed in any subsequent proceedings in that court or a lower court unless evidence subsequently introduced is substantially different or the decision is clearly erroneous

---

**1.** The term "plaintiffs" refers to the twenty-six individual farmers or farm corporations and the three grain elevators seeking damages from the government for negligent inspection of Bird Grain on August 5, 1988. Although Trans-america Insurance Company raises arguments similar to those of plaintiffs, the Court holds later in this opinion that Transamerica has no valid claim.

and works manifest injustice."), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988).

The Court cannot agree with plaintiffs' argument that "very little of the factual basis of the Eighth Circuit's decision, and certainly none of the factual basis relevant for purposes of this motion, has changed." (Doc. 74 at 23.) The government has produced evidence substantially different than what was before Judge Jones and the Eighth Circuit, and more importantly, the government's evidence is uncontroverted. The Court will determine, based upon the expanded factual record, whether the discretionary function exception applies. *See McMichael v. United States*, 856 F.2d 1026, 1031 (8th Cir.1988) (determining, on subsequent appeal following trial, whether discretionary function exception applied).

■ Although the discretionary function exception, if it applies, is jurisdictional in nature, the Court will treat the government's motion as one for summary judgment, rather than as a motion to dismiss, because of the numerous exhibits submitted by the parties in support of and in opposition to the pending motions. *See Layton v. United States*, 984 F.2d 1496, 1498–99 (8th Cir.) (affirming summary judgment for government on discretionary function exception), *cert. denied*, 510 U.S. 877, 114 S.Ct. 213, 126 L.Ed.2d 170 (1993). Because the material facts are not disputed, the Court must determine whether the United States or the plaintiffs are entitled to summary judgment as a matter of law.

**2.** Federally licensed warehouses are subject to four different kinds of inspections, depending upon circumstances. An "original examination" is "the initial examination made of a warehouse after a warehouseman has made application for a license under the U.S. Warehouse Act, or for approval under a storage agreement with Commodity Credit Corporation." (Doc. 63, Ex. 17, Part II, ¶ A.1.) An "amendment examination" occurs when there is "any change in a facility or operating entity requiring a revision of an existing U.S. Warehouse Act license or a storage agreement with Commodity Credit Corporation[.]" (*Id.* ¶ B.) A "subsequent examination" is a "regularly scheduled examination performed after issuance of a U.S. Warehouse Act license and/or approval of a storage agreement with Commodity Credit Corporation." (*Id.* ¶ C.1.) A "special examination" is an "examination to de-

## I. Undisputed Facts

Bird Grain, a now-defunct privately owned grain elevator, was a federally licensed warehouse operating in Elk Point, South Dakota.[2] Dennis Bird was Bird Grain's president and general manager. From March 29 through April 1, 1988, John Iten, a USDA warehouse examiner, conducted a "subsequent" examination at Bird Grain, which involved a review of the elevator's records and a physical inventory of the grain on hand. (Doc. 63, Ex. 1.) At the conclusion of this inspection, Iten identified four problem areas in a Form WA–125 Memorandum of Adjustments.[3] (*Id.*, Ex. 1 at 2.) First, Iten identified two contracts that had not been signed by the grain producers. Iten instructed Bird Grain to have "these signed as soon as possible." Next, Iten listed:

PREVIOUS SHOW SHORT POSITIONS:

The daily position record reveals that you were in a show short or over obligated position in Corn in May, September & October 1987, & January 1988 as high as 8,591 Bu.. [sic] Soybeans showed short in January & February 1987 up to 921 Bu.. [sic] These positions are not allowed under the USWA & UGSA,[4] under which you operate. See that they are eliminated in the future.

A warehouseman is in a show-short position if his storage obligations exceed his stocks. Third, Iten cited Bird Grain for a quality shortage of No. 2 yellow corn ("2YC"). Iten noted on the WA–125 that the elevator's

velop special information at a time other than the regularly scheduled subsequent examination. This may include information not normally developed in the subsequent examination or may be an expansion of an examination element when a complete subsequent examination is not required." (*Id.* ¶ D.1.)

**3.** The Grain Warehouse Examiner's Handbook, which was last updated in 1982, (Doc. 63, Ex. 8), refers to Form TW–125, the predecessor of Form WA–125, which was adopted in 1985. Although the forms are similar, there are some differences in them that are not at issue here.

**4.** "USWA" refers to the United States Warehouse Act, 7 U.S.C. §§ 241–73, and "UGSA" refers to Uniform Grain Storage Agreement.

records showed obligations of 871,849 bushels of 2YC, but he measured only 865,444 bushels, a difference of 6,405 bushels. Iten also noted that the elevator's records showed obligations of sample grade yellow corn (SGYC) of 1,248 bushels, but he measured 10,985 bushels. Thus, Iten stated:

As of the 3–30–88 cut-off date, this station was found to be grade deficient of 2YC by 6,405 Bu. The United States Warehouse Act & Uniform Grain Storage Agreement require that sufficient quantities & qualities of grain be maintained at all times to cover all obligations to others. Please purchase & receive into approved storage space sufficient quantities of sufficient quality Corn to upgrade inventory, so obligations to others are covered by like or better quality Corn.

Finally, Iten cited Bird Grain for a measured soybean shortage of 8,159 bushels, which represented 59 percent of the total obligation for soybeans. (Doc. 63, Ex. 1 at 2, 4.) Iten stated on the WA–125: "To correct, you are requested to reduce soybean inventories, both total & cash, by 8,159 Bu." (Id., Ex. 1 at 2.) The shortage was corrected at the warehouse by reducing the company-owned inventory by 8,159 bushels. As to this last item, Dennis Bird signed the WA–125 as manager following the notation, "Today, 4–1–88, soybeans reduced 8,159 Bu.[,]" and Iten signed as a witness. No similar notations and signatures were made on the WA–125 regarding the quality deficiency in No. 2 yellow corn.

In responding to these four citations listed on the WA–125 for the subsequent examination, Dennis Bird stated:

Deferred payment contracts are from landlords whom [sic] live a long ways away. I will get the tenant to sign for them. · All short positions were covered instantly as soon as we realized we were in a short position. I normally watch this very care-

fully so as to keep us out of a short position. All off grade Corn was replaced while examiner was here. Soybean inventories have been reduced as of date examiner left.

(Doc. 63, Ex. 1 at 3; Doc. 74 at 4 n. 6.) The parties agree that the quality deficiency in No. 2 yellow corn, unlike the soybean shortage, was not immediately corrected at the warehouse.

John Lamborn, then a supervisor in the Central Examination Branch, Kansas City Commodities Office, reviewed the WA–125 issued by Examiner Iten on April 1, 1988, as a result of Bird Grain's subsequent examination, and he also reviewed Dennis Bird's written response to the WA–125. With the exception of the citation for "previous show shorts," Lamborn determined that the items listed on the WA–125 were not serious deficiencies and none of them warranted a follow-up examination. (Doc. 63, Ex. 7 at ¶ 15; Ex. 11 at 57–65.) Lamborn determined that Dennis Bird's commitment to acquire signatures on the two unsigned contracts appeared to be reasonable, and there was no need to expend resources to check on this item. (Id.) Because the "previous show shorts" referred to past shortages and Bird Grain was not in a show-short position at the conclusion of the subsequent examination on April 1, 1988, Lamborn determined there was nothing more to do with respect to that item, and the previous show-shorts, in and of themselves, were not correctable. The parties agree that there was nothing Bird Grain could do as of April 1, 1988, to remedy the previous show-short positions. Lamborn referred the previous show-short positions to the Warehouse Licensing and Contract Division for follow-up on any concerns that division might have about overpayments that may have been made to Bird Grain for storage on government-owned grain under the Uniform Grain Storage Agreement.[5] (Id.)

5. As a result of this referral, Vernon Steenhard, Chief of the Grain Contract Branch, Warehouse License & Contract Division, sent Bird Grain a reprimand letter because the previous show-short positions were a violation of the Uniform Grain Storage Agreement. (Doc. 77, Ex. K.) Steenhard also mentioned in his letter the measured soybean shortage and the quality deficien-

cy in 2YC at Bird Grain as of April 1, 1988. (Id.) Steenhard attests that the previous show-shorts were the only reason he sent the letter, and that it was routine practice to include in such a letter any other items reported on a WA–125, even though the measured soybean shortage and quality deficiency in 2YC were not serious problems. Dennis Bird's response to his letter was satisfac-

Lamborn did not consider the quality deficiency in No. 2 yellow corn to be serious because the deficiency was less than one percent of Bird Grain's total stocks and this was considered operational. (*Id.*) Further, he determined that verification of Bird Grain's corrective action would "entail a full fledged physical inventory and record review," which would be tantamount to a subsequent examination that would take more than 20 hours to perform. (*Id.* Ex. 7 at ¶ 15(c).) Thus, he decided that a warehouse examiner should verify this item during the next regularly scheduled "subsequent" examination. (*Id.*) Finally, Lamborn determined that the soybean shortage was not cause for concern because it was immediately corrected at the elevator in the presence of Examiner Iten. (*Id.* Ex. 7 at ¶ 15(d).) Lamborn stamped the WA–125 with an "Action Taken" stamp that provided a box next to each of the following options: "File Closed," "Next Exam will verify," "Follow-up exam scheduled," "Referred to _____," and "Pending-see memo"; he checked the box for "Next Exam will verify." Lamborn "cleared the WA–125 issued in connection with the March subsequent examination on May 14, 1988." (*Id.* Ex. 7 at ¶ 15; Ex. 11 at 113–14.) The notation "Next Exam will verify" means that all of the items on the WA–125 Memorandum of Adjustments are cleared for filing. (Doc. 84, Ex. 59 at ¶ 1.)

Also during the March 29 to April 1, 1988 time period, Examiner Iten conducted two "special" rollover examinations on temporary storage bunkers used by Bird Grain, identified as section XX and section YY. (Doc. 63, Exs. 2, 3.) These bunkers accounted for 716,000 bushels of licensed space, more than half of Bird Grain's total licensed storage capacity. The bunkers actually held more grain than they were licensed to hold: Bird Grain loaded 316,000 bushels of corn into

section XX in August 1986, and 419,000 bushels of corn into section YY in November 1986. (*Id.*, Ex. 2 at 1, Ex. 3 at 1.) The purpose of the special examinations was to determine whether the bunkers could continue to be used as approved storage space. The bunkers were located approximately one mile east of the elevator's main storage facility. (Iten Dep. at 9.)

Each of these special examinations resulted in the issuance of a WA–125 Memorandum of Adjustments.[6] As to section XX, Examiner Iten noted on the WA–125 that the protective tarp had holes in it and needed repair, that some insects injurious to grain were noted in the bunker, and that a hard spot was located near the middle of the bunker at the peak. (*Id.* Ex. 3 at 2.) On the General Transmittal, Form WA–101, Examiner Iten on April 1, 1988, recommended the bunker structure for continued use, but then stated, "Corn & protective covering not recommended at this time due to repairs needed & hard spot & insects noted." (*Id.* Ex. 3 at 1.) Iten also stated on the Form WA–101: "Continuation of storage contingent upon action taken to comply with WA–125 issued 4–1–88." In a written response on the reverse side of the WA–125 for section XX, Dennis Bird stated: "As soon as the weather warms up we will treat for bugs so as to insure against any damage to our corn. We have checked the tarp over and patched all holes." (*Id.* Ex. 3 at 3 (backside).)

As to section YY, Examiner Iten noted on the WA–125 that the tarp had a tear in the middle peak area and was wearing thin in other areas; he directed Bird Grain to repair the covering as soon as possible. (*Id.* Ex. 2 at 2.) On the General Transmittal, Form WA–101, Iten recommended the bunker structure and corn for continued storage, but

tory. (Doc. 84, Ex. 57 at ¶ 7–8.) Plaintiffs have not produced evidence to contradict Steenhard's declaration.

6. Plaintiffs attached to their complaint a copy of the WA–125 issued on April 1, 1988, in connection with the subsequent examination. Plaintiffs apparently were unaware when the complaint was drafted that two other WA–125s for the temporary storage bunkers had been issued on the same date, and the government did not clarify the matter in its motion to dismiss. The

Eighth Circuit's opinion thus rests on the predicate that there was only one WA–125 issued to Bird Grain on April 1, 1988. As will be discussed below, the Court concludes that the Eighth Circuit's analysis is not now sustainable in light of the expanded factual record. The result of the analysis of the expanded factual record does still, however, find other conduct to which there is no discretionary function exception applicable.

noted the tarp needed repairs and "[r]ollover depends on satisfactory response to WA–125 issued 4–1–88." (*Id.* Ex. 2 at 1.) In his written response on the WA–125, Dennis Bird stated: "I have patched our tarp and will watch this tarp closely so as to be protective of the grain. Any problems with this cover we will order a new one." (*Id.* Ex. 2 at 3 (backside).)

Upon review of these two WA–125s issued during the special examinations of sections XX and YY, supervisor Lamborn determined that the deficiencies were readily correctable and that Dennis Bird responded he would repair the tarps and would treat the grain for insect infestation. Lamborn did not believe follow-up special examinations were warranted, so he cleared these two WA–125s on April 30, 1988, and determined that the next subsequent examination should verify correction of the items regarding the temporary storage bunkers. (Doc. 63, Ex. 7 at ¶ 16; Ex. 11 at 65–66; Ex. 10 at 41.) On each of these WA–125s, he placed the "Action Taken" stamp and checked the box, "Next Exam will verify." (*Id.*, Ex. 2 at 3; Ex. 3 at 3.)

On May 4, 1988, upon receiving Bird Grain's request to continue its license for the temporary storage bunkers, Steven Mikkelsen of the Warehouse Licensing Branch, Warehouse Division in Washington, D.C., through his superior, asked the Warehouse Examination Division to perform a special rollover examination of Bird Grain's temporary storage facilities. (Doc. 63, Ex. 6 at ¶ 1–2, 13.) Mikkelsen states in his declaration that "[e]vidently, the examination had already been performed in March and the examination documents transmitted to my office on April 6, 1988." (*Id.* Ex. 6 at ¶ 13.) Sometime after May 4, 1988, Mikkelsen reviewed the two WA–125s Examiner Iten issued to Bird Grain in conjunction with the special rollover examinations in late March, but Mikkelsen's copies did not show Dennis Bird's responses or the "Action Taken" clearance stamps from the Warehouse Examination Division. (*Id.*) Because Mikkelsen did not know the status of the two WA–125s on the temporary storage bunkers, he requested a special examination to check on the status of these WA–125s. (*Id.*)

Upon receiving the request, supervisor Lamborn instructed Examiner Iten to perform a special examination to check compliance with the April 1, 1988 WA–125s issued in conjunction with the special rollover examinations of bunkers XX and YY. (Doc. 63, Ex. 7 at ¶ 19.) Lamborn's only instructions to Iten were to inspect the temporary storage bunkers XX and YY; Lamborn did not instruct Iten to verify compliance with the WA–125 issued on April 1, 1988, in conjunction with the subsequent examination at Bird Grain, and Examiner Iten was not required to perform a physical inventory. (*Id.* at ¶ 19–20; Ex. 11 at 110.) Iten knew that the purpose of the special examination was to check the two WA–125s issued on April 1, 1988, on temporary storage bunkers XX and YY and that he was not sent to Bird Grain to check on the WA–125 issued as a result of the subsequent examination on April 1, 1988. (Iten Dep. at 47, 125–26.) A copy of the April 1, 1988 WA–125 issued in conjunction with the March subsequent examination would have been in the travel folder Examiner Iten carried with him to Bird Grain to conduct the special examination. (Doc. 77, Ex. M at 46.)

Examiner Iten performed the special examination requested by Mikkelsen, and at Lamborn's direction, on August 5, 1988. (Doc. 63, Ex. 7 at ¶ 20; Doc. 63, Ex. 4.) On the General Transmittal Form WA–101, Examiner Iten stated:

Special examination completed to check compliance with WA–125 issued 4–1–88:

Section XX has been emptied at this time.

Section YY is in the process of being emptied (just started). WA–125 issued to move to other approved storage space as tarp is in state of disrepair & heavy infestation of insects noted. Corn stored here is still in good condition & would grade # 2YC now. Elevator cash position C.O.B. 8–4–88 22,539 Bu.. [sic] Warehouseman states that he has room for approx. 270,000 Bu. in other storage space leaving 140–150,000 Bu. in bunker. 419,000 Bu. loaded into bunker 11–86.

AEG also completed.

(Doc. 63, Ex. 4 at 1.) Examiner Iten testified that he reviewed the elevator's Daily Position Record (DPR) during this special examination and noted the elevator's "cash position C.O.B. 8–4–88 22,539 Bu." because he was "automatically supposed to check that[,]"[7] and it showed that the elevator had no show-short positions dating back to the late March subsequent exam. (Doc. 77, Ex. E at 54; Ex. F at 6.) On the WA–125 issued in conjunction with the August 5, 1988 special examination, Examiner Iten wrote:

SECTION YY—TEMPORARY BUNKER:

As the protective covering in use is in a state of disrepair & a heavy infestation of insects injurious to grain was noted, you are requested to move the corn stored here to other approved storage space as soon as possible & condition.

PLEASE REPLY ON THE REVERSE SIDE OF THIS FORM AS TO ACTION TAKEN TO CORRECT.

(Doc. 63, Ex. 4 at 2.) Dennis Bird entered two separate responses on the WA–125, the last dated October 3, 1988, stating that the process of moving the grain from section YY had been slow because of weather delays. (*Id.,* Ex. 4 at 2 (backside).) The "Action Taken" stamp on this WA–125 indicated that a followup examination was scheduled. (*Id.,* Ex. 4 at 2; Ex. 13 at 28.)

Also on August 5, 1988, at Dennis Bird's request, Examiner Iten conducted an amendment examination to delete temporary storage bunkers XX and YY from Bird Grain's license. (*Id.,* Ex. 7 at ¶ 21; Ex. 5.) The parties agree that no agency rule, regulation, or policy required Examiner Iten to conduct a physical inventory of the grain elevator as part of this amendment examination. On the General Transmittal, Form WA–101, (*Id.,* Ex. 5), Iten wrote:

Special also completed.

AEG to delete Sections XX & YY, temporary bunkers. New station capacity 631,-000 Bu.. [sic] Page 3 of 3, master WA–

310, can be eliminated. WA–310R & 134 updated.

At the time of the August 5, 1988 amendment examination, Bird Grain's total licensed capacity was 1,347,000 bushels and Bird Grain's Warehouseman's Bond, issued through Transamerica Insurance Company, reflected this capacity. (Doc. 84, Ex. 60 at ¶ 5.) Bird Grain remained licensed and bonded for 1,347,000 bushels until September 23, 1988, when its licensed capacity was reduced to 631,000 bushels. (*Id.* & Attachments A & B.) Transamerica issued a new Warehouseman's Bond in September. (Doc. 63, Ex. 48 at 119.)

On November 18, 1988, Bird Grain's license was suspended following a subsequent examination that revealed enormous grain shortages and numerous violations of the Warehouse Act. (Doc. 77, Ex. G.) Reconstructed Daily Position Records revealed that Bird Grain started loading out grain without reducing its obligations immediately after Examiner Iten completed the subsequent examination on April 1, 1988. (*Id.,* Ex. D.) The parties agree that by April 15, 1988, the warehouse was short 73,254 bushels of corn, the deficiency accelerated to 182,619 bushels by the end of April and to 440,238 bushels by the end of May, and the deficiency continued throughout the summer, hitting a high of 475,689 bushels on September 20, 1988. According to the reconstructed records, as of the August 5, 1988 special examination, Bird Grain had an actual co-owned balance of negative 358,011 bushels. (*Id.,* Ex. D. at 6.)

The United States Department of Agriculture took over Bird Grain's operation and liquidated the remaining inventories for distribution to those holding valid storage claims. (*Id.,* Ex. H.) The government prosecuted Dennis Bird for making false statements and converting mortgaged property, and following his guilty plea to one count of the indictment, Bird received a criminal sentence of eighteen months imprisonment. (Doc. 63, Exs. 18–20.)

---

**7.** A September 30, 1987 Memorandum to warehouse examiners from Gordon D. Wiggers, Chief, Warehouse Examination Division, specifically reminded the examiners "to observe the Warehouseman's DPR regardless of the type of examination you are performing. You should look for irregularities and pay particular attention to any 'show short' positions." (Doc. 84, Ex. 56 at 1.) Plaintiffs produce no evidence contradicting the Wiggers memo.

954

## II. Discussion

### A. Discretionary function exception

The Federal Tort Claims Act authorizes suits against the United States for damages for loss of property caused by the negligent or wrongful act or omission of a government employee acting within the scope of his employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). In such suits, the United States generally may be held liable for money damages in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. "The [FTCA] includes a number of exceptions to this broad waiver of sovereign immunity." *Berkovitz v. United States*, 486 U.S. 531, 535, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). No liability for damages may lie for:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). This discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2761–62, 81 L.Ed.2d 660 (1984). "The discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 539, 108 S.Ct. at 1960.

The Court must consider whether the challenged actions were discretionary, or whether they were instead controlled by mandatory statutes or regulations. *United States v. Gaubert*, 499 U.S. 315, 328, 111 S.Ct. 1267, 1277, 113 L.Ed.2d 335 (1991).

"[I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected [from liability] because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert*, 499 U.S. at 324, 111 S.Ct. at 1274; *Tracor/MBA, Inc. v. United States*, 933 F.2d 663, 666 (8th Cir.1991) (citing *Gaubert* for proposition that discretionary function exception protects governmental conduct if regulation mandates particular conduct and government employee obeys direction). If the employee violates the mandatory regulation, however, the government will be held liable because there is no room for choice and the action is contrary to policy. *Gaubert*, 499 U.S. at 324, 111 S.Ct. at 1274.

Plaintiffs contend that Examiner Iten violated a mandatory regulation by failing to comply with "Part IV Special Examinations" in the Grain Warehouse Examiner's Handbook:

> ### C. Preparation of Report
> The report submitted depends upon the reason for which the examination is made. In some cases, only the Form TW–301 need be prepared; in others a complete examination report must be prepared. **In all instances where a previously issued Form TW–125 has not been completely cleared, the examiner is to issue a new Form TW–125 listing those conditions which remain uncorrected at the time of the special examination.** If another special examination is necessary, the same procedure should be followed.

(Doc. 63, Ex. 8 at 33 (emphasis added).) The Eighth Circuit held on appeal that this highlighted sentence in the Grain Warehouse Examiner's Handbook is a mandatory regulation, *Appley Brothers*, 7 F.3d at 725, and the appeals court's pronouncement must remain the law applicable to this case for purposes of the current summary judgment motions. Based upon the limited facts before it at that time, however, the Eighth Circuit held that "the inspectors," actually Examiner Iten, violated the mandatory regulation:

> This case presents a very close question.... Here, there is no question that the ultimate decision to close the ware-

house was discretionary. (footnote omitted) Nevertheless, agency policy required that a new form be issued in the event that the warehouse had not cleared or corrected earlier reported shortages. Here, the August 5 inspection report did not comment on the shortages reported in the April 1 WA–125 form, even though the stated purpose of the inspection was "to check compliance with the WA–125 issued 4–1–88." In conducting the August 5 inspection, the inspectors violated not only the mandatory requirements of the grain inspector's handbook, but also the stated purpose of their inspection. The inspectors had no discretion on August 5 as to whether they should check to see if Bird Grain had cured the deficiencies found on April 1 and to issue a new TW–125 reporting that information. (citations omitted) *Id.* at 725. The undisputed evidence now paints an entirely different picture of what happened in this case, and the Eighth Circuit panel likely would not have ruled the same way had it had before it the facts now before this Court.

The uncontradicted evidence shows that, on May 14, 1988, Supervisor Lamborn "cleared" the WA–125 issued on April 1, 1988, in connection with the subsequent examination, and therefore, the mandatory regulation quoted above did not apply to that "cleared" WA–125 in any event. The evidence shows that Steve Mikkelsen requested a special followup examination only as to the temporary storage bunkers XX and YY. Supervisor Lamborn instructed Examiner Iten to conduct the special followup examination, and he did not instruct Iten to check on the status of the April 1 "cleared" WA–125 regarding the subsequent examination because that WA–125 was to be verified on the next regularly scheduled subsequent examination. Examiner Iten understood the limited scope of the special examination he was to conduct. Iten visited Bird Grain on August 5, 1988, and followed the mandatory regulation quoted above when he issued a new WA–125 requiring Bird Grain to move the corn from bunker YY because he found that unit to be no longer fit for temporary storage. Iten reviewed Bird Grain's Daily Position Report because he had been instructed previously by his superior, Gordon Wiggers, to do so no matter what type of examination he was conducting. It is undisputed that Bird Grain's Daily Position Record did not reveal any show-short positions dating back to April 1, 1988. Where a government employee obeys a mandatory regulation, as Examiner Iten did in issuing a new WA–125 on temporary storage bunker YY on August 5, 1988, the government is protected from liability. *See Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274; *Tracor/MBA, Inc.,* 933 F.2d at 666.

Plaintiffs argue, without providing any factual support, that the scope of Examiner Iten's August 5, 1988 special examination of Bird Grain was much broader than simply a check on the condition of the temporary storage bunkers. Plaintiffs refer again, as they did in the Eighth Circuit, to the Form WA–125 Examiner Iten issued on August 5, 1988 following the special examination, in which he stated: "Special examination completed to check compliance with WA–125 issued 4–1–88[.]" (Doc. 63, Ex. 4 at 1.) Plaintiffs take this sentence out of context, quoting it as if Examiner Iten finished the phrase with a period, (Doc. 74 at 15), and then argue that Examiner Iten referred also to the April 1, 1988 WA–125 issued after the subsequent examination: "Plaintiffs *believe* that the report, particularly the examination of Bird Grain's DPR, shows an actual scope of inspection beyond sections XX and YY and therefore *should be understood* as a reference to all three WA–125s issued on April 1, 1988." (Doc. 74 at 15, emphasis added.)

Close examination of the August 5, 1988 WA–125 reveals that Examiner Iten actually ended the phrase in question with a colon, not a period, and then went on to state his findings with regard to the temporary storage bunkers, the subject of his special examination on August 5, 1988. (Doc. 63, Ex. 4 at 1.) The punctuation Examiner Iten used is significant because a colon is generally placed to indicate that the information to follow is linked with the first idea or to emphasize the information that follows. Through use of the colon, Examiner Iten linked and emphasized his report that he had completed the special examination as directed and his findings with regard to that spe-

cial examination. Plaintiffs also argue that Examiner Iten's check of the Daily Position Record on August 5, 1988, was "simply not relevant to an examination for approval of temporary storage space." (Doc. 74 at 6.) The uncontroverted evidence shows, however, that Examiner Iten simply followed his superior's instruction to review the elevator's DPR no matter what type of examination was being conducted.

Plaintiffs make four additional arguments why the Court should not apply the discretionary function exception: (1) "Plaintiffs believe that U.S.D.A. policy required the correction of overobligated positions [as found during the April 1, 1988 subsequent examination] to be documented so that there could be verification of compliance[,]" (Doc. 74 at 13); (2) Examiner Iten knew on August 5, 1988, that Bird Grain's total obligations then exceeded its licensed capacity after he deleted temporary storage bunkers XX and YY from licensed space, and this was a violation of federal regulations, (*Id.* at 18); (3) Examiner Iten should have known on August 5, 1988, that the "numbers ... reveal[ed] an obvious deficiency in the inventory[,]" which even a cursory physical examination would have exposed, (*Id.* at 19); and (4) that Examiner Iten did not follow policies in the Grain Warehouse Examiner's Handbook and Warehouse Examiner's Handbook General that required him on August 5, 1988, to investigate what had happened to the deteriorating corn previously stored in section XX. (*Id.* at 20.)

█ As to the first argument, plaintiffs assert that *Bird Grain,* not any particular government employee, (Doc. 74 at 14), failed to follow "WD Memorandum 85–1 from the Director, Warehouse Division, to the Director of the Kansas City Commodity Office" (Doc. 63, Ex. 16), because Bird Grain did not report in writing the purchases it made after the late March 1988 subsequent examination to correct the over-obligated position in No. 2 yellow corn. WD Memorandum 85–1 states in part:

*Response to WA–125*

In addition to the reporting of corrective action on other deficiencies, purchases to correct overobligated positions made during the course of the examination shall be reported by the examiner on the face of the WA–125 or an addition thereto as:

*Purchases Verified by Examiner*

Bushel Type Check Date Dollar Purchased Date Kind Amount Purchase* No.** Issued Amount From

\* New grain, warehouse receipts, open storage, other.

\*\* If not paid, indicate "Not Paid"

Purchases allowable to cover shortages shall be only that quantity which exceeds shipments for the period since the cut-off date of the examination during which the shortage was found.

**The warehouseman shall be instructed by the examiner to use the same format in reporting purchases made subsequent to the examination and reported with replies to the memorandum; and with each reporting, to include a summary of the current Daily Position Record showing the relative positions after the purchases and adjustments. These purchases should be verified by the examiner at the follow-up or the next regular examination.**

(Doc. 63 Ex. 16 at 1–2, emphasis added.) Although not expressly stated in the brief, plaintiffs essentially argue that this internal agency policy required Examiner Iten to instruct Bird Grain to report in writing in a particular format the purchases it made to correct the 2YC quality shortage noted on April 1, 1988, following the subsequent examination and required Supervisor Lamborn, upon review of Bird Grain's response, to verify the purchases at the next examination, which occurred on August 5, 1988. Plaintiffs state, without record support, that Supervisor Lamborn "admits" that "[t]he quality deficiency in 2YC had not yet been cleared[ ]" as of August 5, 1988.[8] (Doc. 74 at 22.) Plaintiffs argue that, "[b]ecause the 'paper

---

**8.** As previously documented above, the record shows that Supervisor Lamborn cleared the 2YC deficiency on May 14, 1988, because the grade shortage was less than one percent of total obli-

gations and thus operational, and he noted that the next exam, meaning the next subsequent exam, would verify Bird Grain's corrections.

trail' specified for verification was non-existent on August 5, the only other way to verify correction was by physical inventory." (Doc. 74 at 14.) Plaintiffs imply that Supervisor Lamborn did not instruct Examiner Iten to conduct a physical inventory on August 5, 1988, because Lamborn gave greater consideration to the difficulty of the task and the time needed to perform it than to protection of the grain producers. (*Id.*)

The government argues that WD Memorandum 85–1 does not apply to Bird Grain's 2YC quality shortage as of April 1, 1988. The government produces uncontroverted testimony from Supervisor Lamborn that the term "overobligated positions," as used in WD Memorandum 85–1, refers only to quantity shortages or "show-short" positions, and that information as to quality is not provided because an elevator's Daily Position Record is maintained by kind (corn, wheat, soybeans, etc.) and quantity, not by grade. (Doc. 84, Ex. 59 at ¶ 2–3.) Additionally, the government argues that, even if Bird Grain should have been required to submit specific documentation of its purchases to correct the quality deficiency in corn, WD Memorandum 85–1 did not mandate that Examiner Iten verify Bird Grain's correction by physical inventory at the August 5, 1988 special examination scheduled for other purposes. (Doc. 83 at 11.) The government argues that the agency had discretion whether to verify the correction (85–1 states "[t]hese purchases should be verified . . .") and if so, whether to verify the purchases at a follow-up examination or the next regular examination. The government correctly argues that the record shows the "next regular examination" refers to the next subsequent examination. (Doc. 83 at 11; Doc. 63, Ex. 7 at ¶ 14, Ex. 17 at ¶ C.1.)

■■■■■ Even if WD Memorandum 85–1 mandated that Examiner Iten instruct Bird Grain to report purchases made to satisfy the 2YC deficiency, Supervisor Lamborn retained discretion under WD Memorandum 85–1 to determine how those purchases would be verified. It is the nature of the conduct and not the status of the actor, which determines whether the discretionary function exception applies in a given case. *Gau-*

*bert,* 499 U.S. at 325, 111 S.Ct. at 1275; *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764. "[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* Thus, the Court determines that Supervisor Lamborn's discretionary determination that a quality shortage less than one percent of total obligations was operational, did not warrant a follow-up examination, and should be verified at the next subsequent examination is protected by the discretionary function exception.

■■■ Next, plaintiffs argue that Bird Grain violated federal regulations on August 5, 1988, when Examiner Iten deleted the temporary storage bunkers from Bird Grain's licensed space. Plaintiffs state, without factual support, that Bird Grain's licensed space was reduced to 631,000 bushels (from 1,347,000 bushels) as of the completion of the amendment examination on August 5, 1988, and that Examiner Iten knew from the elevator's Daily Position Record that total obligations as of that date were 834,357 bushels, more than the licensed capacity of 631,000 bushels. Plaintiffs argue that Bird Grain violated a federal regulation by operating with total storage obligations in excess of licensed capacity, 7 C.F.R. § 736.42(c); Bird Grain did not receive an exemption to continue to utilize bunker YY when that bunker no longer qualified as licensed space, in violation of 7 C.F.R. § 736.3a; Bird Grain failed to notify the USDA that it was storing grain in excess of the capacity for which the warehouse was licensed in violation of 7 C.F.R. § 736.42(a); and Bird Grain did not transfer the stored grain to another approved warehouse pursuant to federal regulation, 7 C.F.R. § 736.42(b) & (c).

The fallacy in plaintiffs' argument is the focus upon what Bird Grain did or did not do. Bird Grain is not a defendant in this FTCA case. Plaintiffs do not specifically allege that Examiner Iten himself violated the cited federal regulations or that he could violate them, considering that the regulations themselves are directed to the warehouseman and place on the warehouseman the responsibility for compliance. Moreover, in reply, the government produces uncontroverted evidence that Bird Grain's licensed capacity was not officially diminished until September 23, 1988, when a new license was issued. (Doc. 84, Ex. 59 & Attachments A & B.) For these reasons, plaintiff's argument must fail.

Plaintiffs next suggest that Examiner Iten failed to report an obvious quantity deficiency at Bird Grain on August 5, 1988, because the numbers available to him simply did not add up. There were approximately 410,000 to 420,000 bushels of corn in bunker YY on that date because Examiner Iten's General Transmittal Form WA–101 indicated that "Warehouseman states that he has room for approx. 270,000 Bu. in other storage space leaving 140–150,000 Bu. in bunker." (Doc. 63, Ex. 4 at 1.) Bird Grain's Daily Position Record showed a total of approximately 834,000 bushels in inventory. (Doc. 77, Ex. F at 6.) Subtracting the bunker YY inventory from the total inventory, there remained in the main elevator storage facility 414,000 to 424,000 bushels. With a total licensed capacity of 631,000 bushels, Bird Grain would have had remaining approved space of 207,000 to 217,000 bushels, not the 270,000 bushels Dennis Bird told Examiner Iten that he had. Plaintiffs argue that Bird Grain did not have the capacity to move more than 400,000 bushels of corn in bunker YY into licensed space.

The government responds that Bird Grain retained a total licensed capacity of 1,347,000 bushels until September 23, 1988, and consequently, no obvious deficiency was apparent to Examiner Iten. While it is true that Bird Grain's license was not amended until later, the Court can reasonably infer that Examiner Iten well knew that Bird Grain's licensed capacity would decrease by more than half in a short period of time.

The government's second argument and the evidence produced to support it, however, adequately explains why there was not an obvious deficiency: Lester Bromley, former Branch Chief of the Licensing Branch, attests that Bird Grain could have moved the grain to other approved space at Bird Grain; it could have stored the grain at another federally licensed or federally approved warehouse; or it could have purchased the grain, permitting the grain to remain in temporary bunker YY if it was recorded separately from the grain under license. (Doc. 84, Ex. 60 at ¶ 7.) Plaintiffs do not dispute Bromley's declaration, nor do they argue that Examiner Iten did not know of these options. On the WA–125 issued August 5, 1988, Examiner Iten "requested" Bird Grain "to move the corn stored here [bunker YY] to other approved storage space as soon as possible & condition." (Doc. 63, Ex. 4 at 2.) Iten did not specify that the other approved storage space was required to be located at Bird Grain. Additionally, the WA–125 indicates that Dennis Bird told Examiner Iten that he had room for approximately 270,000 bushels "in other storage space." (Id., Ex. 4 at 1.) Plaintiffs produce no evidence that the only federally-licensed storage space available to Bird Grain was Bird Grain's own facility. Even if it was, the government's evidence shows that Bird Grain nonetheless could have purchased the grain and left it in bunker YY if the grain was recorded separately from grain under license. Thus, plaintiffs have not established that the seeming lack of sufficient storage space at the elevator for the corn in bunker YY constituted an obvious deficiency Examiner Iten knew about, yet failed to report in violation of the handbook.

Plaintiffs next utilize the litigated factual record now available to argue what they think should have been obvious to Examiner Iten on August 5, 1988. They state:

Of even greater significance is that, by Dennis Bird's account, the bins at the main facility should have been on average two-thirds full—that there are between 414,000 and 424,000 on the premises. We know, however, from the reconstructed DPR that Bird Grain's actual inventory on August 5 was 466,327 bushels. (Exhibit D, p. 76).

This means that most of the Bird Grain corn inventory was in YY, with only approximately 45,000–55,000 bushels at the main facility. The main facility in fact was virtually empty on August 5—less than 10% of its capacity—rather than two-thirds full. The shortage amounted to 43% of its total obligations (Exhibit D, P. 76; Exhibit F, p. 140) and 57% of its then licensed capacity (Exhibit D, p. 76; Exhibit 5.) (Doc. 74 at 19.) Plaintiffs assert that "[e]ven a cursory visual inspection at the main facility would have uncovered the shortages." (Doc. 74 at 20.)

The undisputed evidence shows, however, that Bird Grain's Daily Position Record on August 5, 1988, showed total inventory of approximately 834,000 bushels and no show-short positions dating back to April. (Doc. 77, Ex. F at 6.) Examiner Iten was not sent to Bird Grain to conduct a complete physical inventory. He had no reason to believe from Bird Grain's Daily Position Record that he should conduct a physical inventory. Plaintiffs have not alleged in their complaint, nor come forward with evidence showing, that Examiner Iten was indeed aware of the discrepancies between Bird Grain's books and its actual inventory, and yet he failed to report it. *See Judy v. U.S. Dept. of Labor*, 864 F.2d 83, 84 (8th Cir.1988) (upholding dismissal of FTCA action on discretionary function exception where plaintiff did not allege in complaint that inspectors knew hydraulic shaping press was in violation of OSHA safety regulations and "nevertheless decided in the face of this knowledge not to take action[.]").

▮ Finally, plaintiffs argue that Examiner Iten found bunker XX empty on August 5, 1988, but he did not investigate to determine what had happened to the more than 300,000 bushels of corn previously stored there. (Doc. 74 at 20.) Plaintiffs contend that the purpose of a special examination can be, and was in this case on August 5, 1988,

"[t]o check quality deterioration of stocks[,]" in other words, the out-of-condition corn stored in temporary storage bunker XX that had raised Iten's concern during the special examination on April 1, 1988. (Doc. 63, Ex. 17 at 5.) Because Iten had not recommended the corn for continued storage in section XX in April, plaintiffs assert that Iten was required, at the time of the follow-up special examination on August 5, 1988, to determine whether any of the out-of-condition grain from section XX remained within the elevator's storage facilities, and if so, the location and quantity of that grain:

> *Deterioration or Out-of-Condition Grain*—In making an examination of this nature, the examiner is primarily concerned with the commodity and condition specified in the assignment. However, he should not fail to report other obvious deficiencies noted during his examination. Examination reports on out-of-condition commodities should clearly describe the type and extent of damage involved and should assess the warehouseman's capability, or inability, to condition the commodity. **The report must also be specific regarding quantities and locations (within the storage facilities) of out-of-condition commodities.**

(Doc. 63, Ex. 8 at 29, Grain Warehouse Examiner's Handbook, Part IV Special Examinations at ¶ B.2., emphasis added.)

The Court agrees with plaintiffs that the above-quoted handbook provision is a mandatory regulation that required Examiner Iten to determine Bird Grain's disposition of out-of-condition grain [9] previously stored in section XX.[10] Iten's April 1, 1988, WA–125 regarding section XX, although not as specific as the handbook required, leaves no doubt that at least some of the corn stored in section XX was out-of-condition grain. Iten noted a hard spot in the corn, the presence of insects, and a tarp in disrepair, and he did not recommend the corn for continued stor-

---

9. Neither party has established a definition of "out-of-condition" grain and the Court did not find a definition upon examination of the statutes and regulations. The term is taken in its normal meaning as applied to grain.

10. The Court does not accept Supervisor Lamborn's interpretation that no agency policy, handbook, memorandum, or other document required Iten to trace the movement of corn from bunker XX internally within the elevator. (Doc. 84, Ex. 59 at ¶ 7.)

age in section XX. At his deposition, Iten estimated that the peak of section XX on April 1, 1988, was approximately twenty feet high. (Iten Dep. at 38.) The WA–125 he prepared on that date stated that the hard spot was "located towards the middle at the peak[ ]" (Doc. 63, Ex. 3 at 2), but the document does not specify the depth, length, or width of the hard spot nor include any other quantitative statement as to the amount of corn involved, and Iten did not later remember the dimensions of the hard spot. (Iten Dep. at 43.) The WA–125 completed on April 1, 1988, in connection with the subsequent examination reveals that Examiner Iten measured a quality deficiency in corn of 6,405 bushels, but there is no indication that deterioration of corn in section XX accounted for this quality deficiency, and the Court infers that it did not.

Supervisor Lamborn did exercise his discretion to review Dennis Bird's response to the WA–125 issued on section XX on April 1, 1988, and he cleared the form for filing, with verification to take place during the next subsequent examination. However, when Lamborn sent Examiner Iten to Bird Grain on August 5, 1988, at Steven Mikkelsen's request, for the specific purpose of checking on the condition of bunkers XX and YY and performing an amendment examination on the bunkers, Iten could not simply ignore the fact that section XX, which had contained out-of-condition corn, was completely empty. In accordance with the instructions set out in the handbook, Iten had a responsibility to determine whether any of the out-of-condition corn from section XX remained "within the storage facilities." Storage facilities is plural, so at least inquiry should have been made to see if the 300,000 bushels of corn, or some part of it, was elsewhere in the storage facilities. Iten admits that he did not ask Dennis Bird what had happened to the corn in section XX or otherwise investigate whether any part of it was sold or remained within the elevator. (Iten Dep. at 50–51, 139–40.) Since Iten did not check or inquire to see if any corn from XX remained in the elevator or storage facilities, he of course did nothing to see if the out-of-condition corn had been reconditioned or if it had deteriorated further.

In reply, the government argues that grain is a fungible product, and once it is moved, it loses its identity and is not traceable. (Doc. 83 at 13 n. 13.) Even assuming that is true, Iten was not relieved of his responsibility to find out whether the corn in section XX had been moved to other of the numerous bins within the Bird Grain elevator and not commingled or commingled with other grain within the elevator. Through investigating the whereabouts or the condition of the more than 300,000 bushels of corn removed from section XX, it is highly likely that Iten would have discovered the massive shortages at Bird Grain. Where a regulation mandates particular conduct, and the employee disobeys the direction, the government will not be protected from liability because the conduct is not deemed in furtherance of the policies which led to the promulgation of the regulation. *Gaubert*, 499 U.S. at 324, 111 S.Ct. at 1274. Therefore, the Court holds that the discretionary function exception does not protect the United States from liability for the Bird Grain inspection conducted by Examiner Iten on August 5, 1988.

### B. Breach of a regulatory duty

Plaintiffs allege that the United States is liable in damages for breach of a regulatory duty because,

> [a]mong the purposes of the licensing and inspection scheme [set] forth in the [United States] Warehouse Act is the regulation and control of grain storage facilities for the protection of persons and entities who deliver farm products to a federally licensed warehouse facility for storage or sale[.]

(Doc. 1, Complaint at ¶ 20.) Plaintiffs allege that "[a]s a direct and proximate result of the failure of the U.S.D.A. to properly inspect Bird Grain pursuant to its own regulations, Bird Grain was allowed to remain open and continue to operate as a federally licensed warehouse facility." (*Id.* at ¶ 23.)

The United States may be held liable under the FTCA if plaintiffs can establish that the United States, if a private person under like circumstances, would be liable to them in accordance with South Dakota

law. *See* 28 U.S.C. §§ 1346(b), 2674; *Selland v. United States,* 966 F.2d 346, 347 (8th Cir.1992) (per curiam) (holding that plaintiff failed to identify any tort duty under North Dakota law where plaintiff alleged FmHA's failure to release loan funds resulted in death of sheep), *cert. denied,* 507 U.S. 923, 113 S.Ct. 1291, 122 L.Ed.2d 682 (1993). "The violation of a federal statute or administrative regulation by an agency of the United States does not, standing alone, create a cause of action under the FTCA." *Klett v. Pim,* 965 F.2d 587, 589 (8th Cir.1992) (affirming dismissal of FTCA claim for lack of tort duty under Iowa law where farmer alleged FmHA violated statutory and regulatory duties in denying operating loan); *Davis v. United States,* 536 F.2d 758, 759 (8th Cir. 1976) (per curiam) (affirming dismissal of FTCA claim because federally-imposed duties required of OSHA officers had no counterpart under Nebraska law and noting that FTCA is limited to ordinary common law claims); *Johnson v. Sawyer,* 47 F.3d 716, 727–28 (5th Cir.1995) (observing consistent holdings of federal courts that FTCA is not intended to redress breaches of federal statutory or regulatory duties). "[F]ederally imposed obligations, whether general or specific, are irrelevant to ... inquiry under the FTCA, unless state law imposes a similar obligation upon private persons." *Gelley v. Astra Pharmaceutical Prod., Inc.,* 610 F.2d 558, 562 (8th Cir.1979).

Plaintiffs specifically allege as the basis of their first cause of action the violation by U.S.D.A. of federal statutes and regulations, namely, the United States Warehouse Act and the regulatory policies promulgated thereunder. Plaintiffs have not directed the Court to any state law authority which expressly creates a cause of action in negligence for the failure to conduct a proper inspection of a grain warehouse. *See Klett,* 965 F.2d at 589 (observing that plaintiffs failed to point to Iowa law creating a cause of action under FTCA). *See also Hagen v. City of Sioux Falls,* 464 N.W.2d 396, 399 (S.D. 1990) ("It is a basic principle of tort law that public duties created by statute cannot be the basis of a negligence action even as against private tortfeasors.").

Plaintiffs argue, however, that Examiner Iten's violation of U.S.D.A. regulations while inspecting Bird Grain is negligence per se under South Dakota law, citing *e.g., Stevens v. Wood Sawmill, Inc.,* 426 N.W.2d 13, 14 (S.D.1988); *Walz v. City of Hudson,* 327 N.W.2d 120, 122 (S.D.1982); *Albers v. Ottenbacher,* 79 S.D. 637, 116 N.W.2d 529, 531 (S.D.1962). Plaintiffs rely on the Restatement (Second) of Torts § 286, adopted in *Albers,* which provides that a court may adopt a regulation as the negligence standard of care where the regulation's purpose exclusively or in part (a) protects a class of persons including the one whose interest is invaded; (b) protects the particular interest which is invaded; (c) protects the interest against the kind of harm which has resulted, and (d) protects that interest against the particular hazard from which the harm results. Plaintiffs argue persuasively that they fulfill all four of these requirements.

 Nonetheless, federal courts "have generally refused to find the necessary state law *duty* in an asserted violated federal statute or regulation merely because the law of the relevant state included a general doctrine of negligence *per se.*" *Johnson,* 47 F.3d at 728–29; *Art Metal–U.S.A., Inc. v. United States,* 753 F.2d 1151, 1156–60 (D.C.Cir.1985) (upholding dismissal of FTCA action for failure to state claim where plaintiff alleged that General Services Administration officials' violations of federal procurement regulations constituted negligence or negligence per se); *Sellfors v. United States,* 697 F.2d 1362, 1365–67 (11th Cir.1983) (holding that violation of federal regulation does not automatically invoke state law principles of negligence per se), *cert. denied,* 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984). The pertinent question is whether the duties set forth in federal law are analogous to those set out in local tort law. *Id.* at 729. And here, there is not an analogous duty imposed on private persons by state law. The Court adopts the reasoning of the Fifth Circuit in *Johnson,* 47 F.3d at 729:

[T]o allow FTCA recovery merely on the basis of a general doctrine of negligence *per se,* without requiring that there be some specific basis for concluding that sim-

ilar conduct by private persons or entities would be actionable under state law, is to in essence discriminate against the United States: recovery against it is allowed, although for similar conduct the private person or entity would not be subject to liability under state law. Plainly, the FTCA waiver of sovereign immunity does not go so far.

Consequently, the Court concludes that plaintiffs' first cause of action for breach of a regulatory duty must be dismissed. *See Klett,* 965 F.2d at 589–90; *Gelley,* 610 F.2d at 563.

### C. *Breach of a common law duty*

In their second cause of action, plaintiffs allege that "the Secretary of Agriculture is charged with the statutory responsibility of licensing warehouses found to be suitable for the proper storage of agricultural products[,]" and they reallege that

> [a]mong the purposes of the licensing and inspection scheme [set] forth in the [United States] Warehouse Act is the regulation and control of grain storage facilities for the protection of persons and entities who deliver farm products to a federally licensed warehouse facility for storage or sale[.]

(Doc. 1, Complaint at ¶ 26–27.) Further, plaintiffs allege that they "reasonably relied upon defendant, acting through its authorized agents[,] to exercise reasonable care in the performance of inspection and licensing services." (*Id.* at ¶ 29.) As a result of the inspection on August 5, 1988, plaintiffs allege that Bird Grain was allowed to remain open and they subsequently suffered damages when Bird Grain defaulted on its obligations. (*Id.* at ¶ 30–31.)

Plaintiffs correctly argue that a common law duty may be established in two ways. Under South Dakota law, a noncontractual duty may be imposed by common law, statute, implication or operation of law, public policy, or from the failure to exercise that care which a reasonable person would exercise under like circumstances. *F & M Agency v. Dornbush,* 402 N.W.2d 353, 356–57 (S.D.1987) (citing Restatement (Second) of Torts § 285); *Hurst v. United States,* 739 F.Supp. 1377, 1381 (D.S.D.1990) (FTCA case). A second basis for imposition of a common law duty arises from the undertaking to render services to another, known as the "Good Samaritan" doctrine. *See Schoenwald v. Farmers Coop. Ass'n,* 474 N.W.2d 519, 521–22 (S.D.1991) (applying Restatement (Second) of Torts § 324A). Section 324A provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Although the government argues that Warehouse Act inspections are conducted only for the benefit of the United States, and therefore, no "undertaking to render services to another" exists, the Court concludes that a primary purpose of Warehouse Act inspections is to protect producers and others who store their grain in federally licensed warehouses. (Doc. 77, Ex. I at 2; Ex. J at 2; Doc. 63, Ex. 17.) The *Schoenwald* result does not control, as the government argues, because in that case the South Dakota Supreme Court affirmed a finding of no duty under § 324A of the Restatement because the grain elevator insurer did not undertake to perform a duty of providing a safe working environment owed by the grain elevator to its employees. *Schoenwald,* 474 N.W.2d at 522. The court noted the absence of evidence indicating that the insurer intended to benefit the employees of the elevator by conducting inspections. *Id.*

In this case, there is evidence that Congress primarily intended to benefit the sellers and depositors of grain by requiring warehouse compliance inspections, (Doc. 77, Ex. J at 2), and thus, U.S.D.A., in conducting

such inspections at Bird Grain Elevator, undertook to render services to grain producers and others who deposited grain with the elevator, as contemplated by the Restatement. *See generally Indian Towing Co. v. United States,* 350 U.S. 61, 64–65, 76 S.Ct. 122, 124–25, 100 L.Ed. 48 (1955); *Johnson,* 47 F.3d at 728. *See also* Restatement (Second) of Torts § 323; *Block v. Neal,* 460 U.S. 289, 297, 103 S.Ct. 1089, 1094, 75 L.Ed.2d 67 (1983) (recognizing, under Good Samaritan doctrine, that FmHA inspector had duty to use due care to ensure house builder adhered to approved plans and cured defects before completing construction); *Limpert v. Bail,* 447 N.W.2d 48, 50–52 (S.D.1989) (recognizing that one who undertakes to provide professional services has duty to person for whom services are performed to use such skill and care ordinarily exercised by others in same profession).

■ The Court concludes that it is not a primary purpose of the Warehouse Act to protect the sureties of warehousemen, such as Transamerica Insurance Company, and the Court concludes that Transamerica has no valid claim. The relationship between the United States and Transamerica is governed by suretyship, not tort law, as discussed in the Memorandum Opinion and Order entered in CIV 92–4110.

■ The Court further concludes that the plaintiff farmers, farm corporations, and grain elevators that delivered grain to Bird Grain reasonably relied upon the U.S.D.A. warehouse inspections. Congress recognized that grain "sellers and depositors, the owners of stored inventory, ... individually are not in a position to determine whether their interests are being properly safeguarded." (Doc. 77, Ex. J at 2.) In its own Warehouse Examiner's Handbook—General (Doc. 63, Ex. 17 at x), U.S.D.A. instructs its warehouse examiners: .

> An individual depositor, other than the Commodity Credit Corporation, cannot ordinarily make the kind of tests or examinations necessary to assure himself that a warehouse operation as a whole is sound and solvent. He lacks the authority, the means, and the knowledge required to make a complete examination, and without

a complete examination, he cannot be certain that his interests are fully protected.

> The primary purpose of a warehouse examination is, therefore, to protect the interests of depositors and their pledgees. In examining a Federally-licensed warehouse, we represent the interest of a great many depositors and holders of Federal warehouse receipts, whereas, in examining non-Federally licensed warehouses, our principal purpose is to protect the interests of the Commodity Credit Corporation.

The record is replete with testimony from plaintiffs that they were familiar with U.S.D.A. procedure for sealing grain and the resulting scrutiny of such sealed grain; they were not in a position to investigate Bird Grain themselves; they knew Bird Grain was a federally licensed warehouse; and they relied upon the federal inspections to safeguard their grain sales and deposits. (Doc. 63, Exs. 22–48; Doc. 77, Exs. R–X.) Although the government argues this testimony is insufficiently specific to show reliance on the August 5, 1988 inspection, the Court determines that it is, particularly when the U.S.D.A. handbook clearly informs warehouse examiners that depositors are relying on the examiners' expertise in conducting warehouse examinations. Consequently, once the United States undertook inspections of Bird Grain Elevator and engendered reliance on those inspections, the United States was obligated to use due care in making those inspections.

■ Examiner Iten owed a common law duty to the individual farmers, farm corporations, and other grain elevators who conducted business with Bird Grain Elevator to use due care in conducting the August 5, 1988 special examination. Examiner Iten breached that duty when he failed to follow a mandatory agency regulation requiring him to determine the location or disposition of out-of-condition grain formerly stored in bunker XX. His breach of duty was the proximate cause of damage to the plaintiffs, who delivered additional grain to Bird Grain Elevator for sale or storage after the August 5, 1988 special examination. If Examiner Iten had discovered the massive grain shortages in early August 1988, U.S.D.A. regu-

lators undoubtedly would have closed Bird Grain then, as they actually did in November 1988, and plaintiffs could have avoided losses incurred during the fall harvest of 1988. For these reasons, the Court grants these plaintiffs' motion for partial summary judgment on liability, dismisses Transamerica Insurance Company as a plaintiff, and denies the government's motion for summary judgment.

The Court has considered and denies on the basis of futility Transamerica's motion to amend the complaint. The Court has already adjudicated Transamerica's liability under the Warehouseman's Bonds in the consolidated case of CIV 92–4110, so amendment of the complaint to seek declaratory relief under the bonds is unnecessary and is denied. Because a common law duty does not run from U.S.D.A. to Transamerica as surety for Bird Grain, the Court will not permit Transamerica to amend the complaint for the purpose of seeking $50,000 in damages for claims paid under Bird Grain's state grain dealer's bond. Accordingly,

IT IS ORDERED:

(1) that the United States' Motion to Dismiss or, Alternatively, For Summary Judgment is denied. (Doc. 59.)

(2) that Transamerica Insurance Company is dismissed from this suit as not a proper plaintiff.

(3) that the remaining plaintiffs' Motion For Partial Summary Judgment on liability is granted. (Doc. 73.)

(4) that the Court will hold a scheduling conference in CIV 92–4037 concerning a court trial on damages on Monday, May 20, 1996, at 3:30 P.M., CST, at the Federal Courthouse in Sioux Falls, South Dakota. Counsel may appear by telephone with prior notice to the Court.