United States Court of Appeals
FOR THE EIGHTH CIRCUIT

_____

No. 97-1453

_____

| | | |
|---|---|---|
| Albert F. Deuser; Tina Marie Sellers, | * | |
| by and through her guardian, natural | * | |
| mother and next friend Joann Sellers; | * | |
| Phyllis Menke, | * | |
| | * | |
| Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| David Vecera, National Park Ranger; | * | |
| Edward Bridges, National Park | * | |
| Ranger; Dennis Burnett, Chief | * | |
| Ranger; United States of America, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: January 14, 1998
Filed:  March 26, 1998

_____

Before BOWMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and
    JONES,[1] District Judge.

_____

BOWMAN, Circuit Judge.

_____

    [1]The Honorable John B. Jones, United States District Judge for the District of
South Dakota, sitting by designation.

Tina Marie Sellers, by and through her mother Joann Sellers; Albert Deuser; and Phyllis Menke appeal from the order of the District Court[2] dismissing for lack of subject matter jurisdiction their claims brought under the Federal Tort Claims Act (FTCA).  We affirm.

I.

The District Court dismissed appellants' claims under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, holding that the government was protected from suit by the discretionary function exception of the FTCA.  We review de novo.  See Appley Bros. v. United States, 7 F.3d 720, 722 (8th Cir. 1993).  "[W]e accept all of the factual allegations in [the] complaint as true and ask whether, in these circumstances, dismissal of the complaint was appropriate."  Berkovitz v. United States, 486 U.S. 531, 540 (1988).  Because the District Court adduced facts beyond the skeletal allegations of the complaint, we too will recite the more complete story.[3]  There are some disputed facts, but resolution of those disputes is not necessary

_____

[2]The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri.

[3]Appellants are confused about the procedural posture of this case.  In the section of their brief headed "Standard of Review," appellants state, "The Court must treat Defendant's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) as a Motion for Summary Judgment when matters outside the pleadings are presented and not excluded by the Trial Court."  Brief of Appellants at 6.  The District Court did go beyond the allegations in the appellants' complaint in making the decision to dismiss, but did not treat the government's motion as one for summary judgment, and properly so.  "The district court has the authority to consider matters outside the pleadings on a motion challenging subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."  Drevlow v. Lutheran Church, Mo. Synod, 991 F.2d 468, 470 (8th Cir. 1993).  The court's election to do so does not convert the 12(b)(1) motion to dismiss into a motion for summary judgment.  See Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990).  In any event, appellants do not claim they suffered any prejudice as a result of the District Court's procedural treatment of the motion.

for us to decide whether there is subject matter jurisdiction under the FTCA.

Tina Sellers is the daughter of, and Albert Deuser and Menke are the parents of, Larry Deuser, who is deceased. On July 3-6, 1986, the event known as the Veiled Prophet (or VP) Fair was held on the grounds of the Jefferson National Expansion Memorial in St. Louis, Missouri (the site of the Gateway Arch). Because the Expansion Memorial is a national park (a special use permit was issued to the city of St. Louis for the Fair), the Secretary of the Interior is responsible for maintaining the park and its facilities and for providing services to visitors, functions generally carried out by the National Park Service. See Universal Interpretive Shuttle Corp. v. Washington Metro. Area Transit Comm'n, 393 U.S. 186, 187 & n.1 (1968). The park is within the jurisdiction of the National Park Rangers. On the evening of July 4, 1986, many thousands of people were in attendance at the Fair, including Larry Deuser. Rangers David Vecera and Edward Bridges observed Deuser grabbing women on the buttocks, to the obvious outrage of the victims and others. The rangers warned Deuser, and continued to keep an eye on him. When he urinated in public, the rangers arrested him. As the rangers made their way to their tent with Deuser, he was argumentative with them and continued making rude comments to female visitors.

After conferring with chief ranger Dennis Burnett, the rangers elected to turn Deuser over to St. Louis police. But the police department was overwhelmed with the additional workload created by the Fair, and officers were unable or unwilling to process Deuser's arrest. At this point, the rangers, together with St. Louis police officer Lawrence King, decided to release Deuser, but away from the park so that he would not return to the Fair that evening.

There is some dispute between the parties about where Deuser was released, and also some question of the timing of the events that occurred that night. It is sufficient for our purposes to know the undisputed facts: Deuser was freed in a parking lot somewhere in St. Louis, alone and with no money and no transportation. At some time

after that, he wandered onto an interstate highway and was struck and killed by a motorist. Deuser's blood alcohol level was 0.214 at the time of his death, well above the legal limit for intoxication.

The appellants brought a variety of state and federal claims against a number of municipal and federal actors. When this case was before us previously, we held that summary judgment for various of the defendants was proper on the claims brought under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and 42 U.S.C. § 1983. See Sellers v. Baer, 28 F.3d 895 (8th Cir. 1994), cert. denied, 513 U.S. 1084 (1995). The FTCA claim for Deuser's wrongful death and a state law claim against police officer King remained. As we noted above, the District Court now has dismissed the FTCA claim for lack of subject matter jurisdiction. In addition, the court declined to exercise supplemental jurisdiction over the state law claim against King (a decision that has not been appealed).

II.

By enacting the FTCA, Congress opted to waive the sovereign immunity to civil suit enjoyed by the United States, and to give consent to be sued "for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee" of the United States acting within the scope of his employment. 28 U.S.C.A. § 1346(b)(1) (Supp. 1997). The federal courts have subject matter jurisdiction over such claims "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Id. But, as is true in other cases where Congress on behalf of the United States has waived sovereign immunity, amenability to suit is not without exception.

The exception relevant here is commonly known as the discretionary function exception. It is statutory and shields the government from civil liability for claims

"based upon the exercise or performance . . . [of] a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a) (1994).  The exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984).

To determine whether the discretionary function exception applies here to protect the rangers and the United States from suit, we engage in a two-step inquiry.

A.

First, we must consider whether the actions taken by the rangers as regards Deuser were discretionary, that is, "a matter of choice."  Berkovitz, 486 U.S. at 536.  "[C]onduct cannot be discretionary unless it involves an element of judgment or choice."  Id.  It is axiomatic that a government employee has no such discretion "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow."  Id.  If the rangers had a policy they were to follow in releasing Deuser, as the appellants contend, "then there is no discretion in the conduct for the discretionary function exception to protect."  Id.

There are two written policies that the parties contend are of relevance here.  The first is the Jefferson National Expansion Memorial Standard Operating Procedure for arrests (SOP), dated December 22, 1987.[4]  The opening declaration of the SOP

_____

[4]Although Deuser's arrest occurred in July 1986, it is the December 1987 version of the SOP that is reproduced in the Addendum to the Brief for Appellants and in the Joint Appendix.  Appellants make their arguments based on this version, and the appellees state in their brief, "We have no reason to believe that the 1986 SOP was substantially different than the 1987 SOP."  Brief of Appellees at 5 n.5.  Accordingly,

suggests there is little room for discretionary decisionmaking on the part of the rangers in an arrest situation: "When an arrest is made by National Park Rangers within the jurisdiction of Jefferson National Expansion Memorial, the following procedures *will always be followed*: . . . " Standard Operating Procedure--Arrests at 1 (emphasis added). The arrestee is to be searched, and if possible fingerprinted and photographed, before transport. The prisoner, handcuffed behind his back, is to be transported by two rangers. During business hours, the arrestee "will continue to be taken directly to the U.S. Marshall's [sic] Office." Id. at 2. At others times (or so we, and apparently the parties, infer from the SOP, although it is not clearly stated), "[t]he arresting Ranger plus a Shift Supervisor will transport the prisoner to the Fourth District Holdover Facility at 1200 Clark Avenue (Clark and Tucker) using the division vehilce [sic]," id. at 1, unless the facility is full, in which case prisoners are to be taken to one of the alternative locations noted in the SOP. There are very detailed instructions for gaining access to the Fourth District facility. Once inside, the rangers are to proceed to the booking area with the prisoner, complete the necessary paperwork, and remove all personal property from the prisoner. "The prisoner will then be turned over to the Holdover personnel and taken up to the cell block." Id. at 2. Except for some additional paperwork and later transport of the suspect for court appearances, the rangers' job is done once the prisoner is taken to the proper holding facility. This, appellants contend, is the procedure the rangers were compelled to follow with Deuser after they arrested him.

The rangers argue (and the District Court concluded) that the SOP arrest policy was abrogated temporarily by the VP Fair 1986 Operations Handbook. The Handbook emphasizes the "primary role" of the rangers during the Fair: "resource protection followed by the things we do best, visitor services and visitor care." VP Fair 1986

---

we accept the 1987 SOP as stating policies in effect in July 1986.

Operations Handbook--Overview and Hindsight para. 6.[5]  The opening paragraph of the Handbook's General Enforcement Guidelines makes it clear that the guidelines are in fact quite general and are for use by the rangers "in enforcement contacts[,] but in no way should [they] be construed as a substitute for sound judgement and discretionary action on the part of the Ranger."  The guidelines then cover the areas of concern for enforcement by rangers during the Fair:  traffic control; liquor law violations; city ordinances in effect for the duration of the Fair concerning alcoholic beverages, glass containers, and pets; access to the Arch; and a variety of crimes against persons from simple assault to murder.  The Enforcement section of the Handbook then wraps up with a paragraph that makes it clear the rangers have wide latitude in making enforcement decisions:

> This will be a busy weekend and our holdover facilities at the 4th District may or may not be available per our existing agreement.  Transport of federal prisoners to either St. Clair in Illinois or Cape Giraudeau [sic] in Missouri will tie up rangers that we can ill afford and create an extreme workload on the 7th of July [the first business day after the Fair] when we can least afford it.  That does not mean we will not take appropriate action, only that our actions will be tempered with reality and arrests will only be on a "last resort" basis.

The rangers' argument--that the Handbook superseded the SOP for arrests on the grounds of the Expansion Memorial during the Fair--misapprehends the Handbook guidelines.  The Handbook was intended to provide guidance to the rangers on the extent to which certain laws should be enforced during the Fair.  Read as a whole, the Handbook suggests that enforcement in many circumstances might be relaxed during

---

[5]The Handbook pages reproduced in the record are unnumbered.  It is unclear to us whether the copy we have been provided is complete or whether the two sections reproduced, "Overview and Hindsight" and "General Enforcement Guidelines," have been excerpted.  In this opinion, we refer to the reproduction we have as if it is an inclusive copy of the Handbook.

the event, so that arrests would be kept to a minimum. The rangers' "sound judgement and discretionary action" was to be exercised in the context of making decisions on *whether to make an arrest at all*; the Handbook never touches on the procedure to be followed in the event an arrest is made (except to note that holding facilities and rangers will be busy during the Fair). The Handbook did not override the standard operating procedures.[6] Based on the record before us, it appears the SOP for processing arrestees remained unchanged during the Fair. Still, that conclusion does not mean that the rangers were required to complete an arrest, that is, to charge and incarcerate a suspect, once he was in custody.

---

[6]For one of their arguments, appellants claim that a provision in the Handbook, under the heading "Liquor Law Violations," specifically says that the SOP should prevail when dealing with liquor law violations during the Fair. Appellants are mistaken. The sentence at issue concerns the policies and penalty guides set by Fair organizers for underage drinking and for the hours of operation for vendors selling alcoholic beverages (neither of which, incidentally, have anything to do with the conduct that led to Deuser's arrest). The Handbook states that federal park rangers are not permitted to enforce the organizers' policies, but continues, "We will enforce ours in accordance with the SO's." Appellants evidently believe "SO's" equates with SOP. But in the "Traffic Control" subdivision, just above the liquor law paragraph, the Handbook defines the SO acronym: "Restrictions as to weight limitations, size limitations, etc. will be found in the Superintendent's Orders (SO)." It is clear from simply reading the entire Handbook that references to "SO's" therein are references not to the Standard Operating Procedures for the park but to Superintendent's Orders.

Appellants also claim that the paragraph from the Handbook we have quoted above gave rangers discretion to act only on July 7, not July 4. That argument is absurd. The Fair ran from Thursday, July 3 to Sunday, July 6 and the paragraph opens by referring to the "busy weekend." July 7 was a Monday and the Fair was over. Why would the Handbook refer to enforcement decisions to be made during the Fair, and then make the guidelines applicable only after the Fair was over? It is clear that the reference to July 7 concerned matters that would be pending because of the Fair but that could not be handled until the first business day after the Fair.

We know that Deuser was arrested by the rangers. The SOP to be followed when a person is arrested by a ranger at the Expansion Memorial is precise and, as to the salient points, mandatory. Appellants are correct that there was very little discretion to be exercised, at least for as long as Deuser was under arrest. And it seems that the rangers initially followed the prescribed procedure: they searched Deuser and handcuffed him before transporting him. After that, it is true that the SOP was not followed--but when Deuser was released in the parking lot, the arrest was terminated. He was free to go, and further arrest procedures--booking the prisoner and so forth-- were irrelevant. Deuser was not charged with a crime, so there was no reason to follow the procedures for incarceration.

The question remains whether a ranger's decision to *terminate* an arrest made at the park during the Fair would require the same sort of judgment and choice as would the initial decision to *make* the arrest. We think that it would. There is nothing in either the SOP or the Handbook that sets forth a policy--whether discretionary or otherwise--for terminating an arrest. But we conclude that this is because the decision to terminate an arrest is closely akin to the decision to make the arrest in the first place. Law enforcement decisions of the kind involved in making or terminating an arrest must be within the discretion and judgment of enforcing officers. See, e.g., Redmond v. United States, 518 F.2d 811, 816-17 (7th Cir. 1975) ("It cannot be denied that the Government has a duty to maintain law and order, but how best to fulfill this duty is wholly within the discretion of its officers . . ."). It would be impossible to put into a manual every possible scenario a ranger might encounter, and then to decide in advance for the ranger whether an arrest should be made and, once made, under what circumstances an arrest could be terminated. Just as the rangers had discretion to decide (within constitutional limits, of course) when and whether to make an arrest, so they had--and here exercised--discretion to terminate an arrest without charging the suspect. Under the terms of the Handbook, that discretion became even broader during the Fair.

We hold that terminating Deuser's arrest, that is, releasing him without charging him with a crime, was a discretionary function reserved to the judgment of the rangers.

B.

We move now to the second part of our inquiry. Notwithstanding the judgment involved in terminating Deuser's arrest, we must ask "whether that judgment is of the kind that the discretionary function exception was designed to shield." Berkovitz, 486 U.S. at 536. To be protected, the rangers' conduct must be "grounded in the social, economic, or political goals" of the Handbook's discretionary enforcement guidelines. United States v. Gaubert, 499 U.S. 315, 323 (1991). Because those published guidelines are clear and give officers wide discretion in making enforcement decisions during the Fair, the rangers at the outset enjoy the presumption that their conduct in releasing Deuser meets the second part of the test: that their actions were "grounded in policy." Id. at 324. That is, if a provision of the Handbook "allows the employee discretion, the very existence of the [provision] creates a strong presumption that a discretionary act authorized by the [provision] involves consideration of the same policies which led to the promulgation of the" Handbook. Id. Appellants have alleged no facts to rebut that presumption, no facts that "would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy" of the Handbook. Id. at 324-25. In fact, they do not even address this step of the discretionary function analysis in their brief.

We think the conduct of the rangers here is the classic example of a "permissible exercise of policy judgment." Berkovitz, 486 U.S. at 539. Social, economic, and political goals--all three--were the basis for the actions taken by the rangers.

An important function of the rangers during the Fair, according to the Handbook, was to serve and protect visitors to the park. Clearly, the decision to remove Deuser from the park served the social goals of protecting innumerable other fairgoers and

-10-

ensuring that their enjoyment of the festivities was not diminished by the obnoxious and offensive behavior of a fellow attendee. Further, the decision to release Deuser, rather than to charge him for the offenses he committed, may have prevented a night of revelry that obviously was out of control from becoming a criminal conviction. And the rangers who otherwise would have spent considerable time booking Deuser were free to return to the Fair, possibly to prevent more serious or more dangerous crimes from being committed, or to apprehend the perpetrators of graver offenses, thereby continuing to further the goal of visitor protection.

The economic goals of the guidelines are clear, and are spelled out in some detail in the Handbook. Law enforcement manpower was expected to be stretched thin, both during the Fair and on the first business day following the Fair, when arrestees would have to be transported for court appearances. (In fact, the SOP tells rangers to expect the process to take all day, even under ordinary circumstances.) There were simply not enough officers to arrest and to charge all persons who might commit a crime at the park during the four-day Fair. The rangers' colleagues, St. Louis police department officers, were expected to be equally taxed with their own enforcement duties. Moreover, it was anticipated that the nearest holdover facility would be overcrowded with arrestees, meaning more miles and more manpower to transport suspects to alternative holdover facilities and to see to their arraignments. Releasing Deuser without charging him preserved already scarce law enforcement resources.

The political goals to be served by the guidelines concern law enforcement "territories." The Fair was not a National Park Service event. The Handbook acknowledges that "[t]he St. Louis Police Department is the lead agency for law enforcement." VP Fair 1986 Operations Handbook--Overview and Hindsight para. 6. As the chief ranger stated in the Handbook, the federal park rangers' "primary role is defined as resource protection followed by the things we do best, visitor services and visitor care." Id. When the police opted not to process Deuser's arrest, the rangers appropriately decided not to override the decision of "the lead agency for law

-11-

enforcement." The Fair's success depended in part on all enforcement agencies involved working together toward a common goal, and the rangers acted properly to preserve that cooperation by releasing Deuser in this situation. Further, the Fair was designed to be an enjoyable event for the city, and it would have been unfortunate if overzealous federal law enforcement had dampened the festivities.

The language of the Handbook itself summarizes the social, economic, and political policies at work here: "This level of enforcement [necessary to achieve the rangers' primary responsibilities] is determined by Park Management and is deliberately kept flexible enough to maximize utilization of our available resources and minimize resource damage without becoming a 'roadblock' to the fair and the fair-goer." Id. para. 7. We hold that the conduct of the officers here was grounded in the social, economic, and political policies of the Handbook.

### III.

To sum up, the rangers' decision to release Deuser away from the park, without charging him with a crime (1) required the exercise of judgment as noted in the Handbook and (2) implicated consideration of the social, economic, and political policies behind the Handbook's enforcement guidelines. Thus the rangers' conduct falls within the discretionary function exception of the FTCA, and there is no federal subject matter jurisdiction for appellants' FTCA wrongful death claims.

The judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-