# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 97-1902

_____

Appley Brothers; Appley Farms,    *
Inc.; Kevin Beerman; Tom Curry;    *
Dakota Eastern, Ltd.; Hayes &    *
Hayes, Inc.; Sam Hatton; Robert    *
Hebeler; Dean Hebeler; Heckathorn    *
Farms, Inc.;Curt Jervik; Dennis    *
Kjose; Gordon Kleihauer; David    *
Larsen; Morris Larsen; Todd Larsen;    *
Lyle Lawrensen; Eldean Lykken;    *
Lawrence McInerney; Martin    *  Appeal from the United States
McInerney; Daniel O'Connor; Kelly    *  District Court for the
O'Connor; Owen Quall; Burnette    *  District of South Dakota.
Quam; Mark Quam; Lyle Wagner;    *
Kaylor Grain Co.; Viborg Coop    *
Elevator; Hurley Elevator;    *
   *
   Plaintiffs - Appellees,    *
   *
   v.    *
   *
United States of America,    *
   *
   Defendant - Appellant.    *

_____

Submitted: December 11, 1997
Filed: January 15, 1999

_____

Before MCMILLIAN, JOHN R. GIBSON, and MAGILL, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

This Federal Torts Claims Act case based on negligent inspection of a grain warehouse is before us for the second time. In Appley Brothers v. United States, 7 F.3d 720 (8th Cir. 1993) (Appley Brothers I), we reversed the district court's dismissal of Appley Brothers'[1] suit. We ruled that Appley Brothers' claim was based on the U.S.D.A.'s breach of a mandatory duty, and therefore jurisdiction of the suit was not barred by the discretionary function exception to the F.T.C.A. We remanded the case to the district court and, after developing a factual record inconsistent with the facts before us on the motion to dismiss, the government moved for summary judgment, again arguing that the suit was barred by the discretionary function exception. Appley Brothers also moved for partial summary judgment. The district court denied the government's motion for summary judgment and granted summary judgment on the merits in favor of Appley Brothers. Appley Brothers v. United States, 924 F. Supp. 944 (D. S. D. 1996). The court held, on the expanded record, that the mandatory duty on which we based our ruling in Appley Brothers I was not applicable. Nevertheless, the court held that the U.S.D.A. breached a different mandatory duty that caused Appley Brothers' losses. The court awarded damages of $516,479.69. On appeal, the government argues the court erred in concluding that the discretionary function

---

[1]The appellees are farmers, farm corporations, and grain elevators who sold or stored grain at Bird Grain Company: Appley Brothers; Appley Farms, Inc.; Kevin Beerman; Tom Curry; Dakota Eastern, Ltd.; Hayes & Hayes, Inc.; Sam Hatton; Robert Hebeler; Dean Hebeler; Heckathorn Farms, Inc.; Curt Jervik; Dennis Kjose; Gordon Kleihauer; David Larsen; Morris Larsen; Todd Larsen; Lyle Lawrensen; Eldean Lykken; Lawrence McInerney; Daniel O'Connor; Kelly O'Connor; Martin McInerney; Owen Quall; Burnette Quam; Mark Quam; Lyle Wagner; Kaylor Grain Co., Inc.; Viborg Coop Elevator; and Hurley Elevator. For convenience, we will refer to them collectively as Appley Brothers.

exception did not apply and in determining that U.S.D.A. owed Appley Brothers a duty of care based on the "Good Samaritan" doctrine. We affirm.

Appley Brothers deposited its grain for sale or storage with Bird Grain Company, a warehouse licensed by the Department of Agriculture under the United States Warehouse Act, 7 U.S.C. §§ 241-273 (1994). U.S.D.A. inspectors discovered massive grain shortages at Bird Grain in November 1988. The U.S.D.A. suspended Bird Grain's license on November 18, 1988. Bird Grain was not able to satisfy the claims against it, and Appley Brothers received a pro rata distribution. Appley Brothers sued the United States alleging that the U.S.D.A. inspection of August 5, 1988, should have revealed the grain shortages, and that if the U.S.D.A. had discovered the shortages earlier, it would have revoked Bird Grain's license and prevented Appley Brothers from delivering grain to Bird Grain after that date.

U.S.D.A. inspectors conducted inspections of Bird Grain on three occasions in 1988: March 29 through April 1;[2] August 5; and November 15.

The U.S.D.A. handbooks define four distinct types of examinations, with differing purposes and scopes. An "original" examination is performed on a warehouse to determine whether it meets the standards for licensing under the Warehouse Act. After a warehouse is licensed, the U.S.D.A. regularly schedules "subsequent examinations" to determine that the warehouse is operating in compliance with the Act and regulations. These subsequent examinations include an attempt to ascertain that the warehouse has sufficient quantities of grain on hand to meet its obligations to its customers. The U.S.D.A.'s goal is to conduct subsequent examinations twice a year at licensed warehouses, on a surprise basis. A "special examination" is defined in the U.S.D.A.'s Grain Warehouse Examiner's Handbook as a limited examination to obtain specific information, to be scheduled as needed. A special examination would be

---

[2]We will refer to this inspection as the April 1 inspection.

conducted upon request of the "Washington, national, area, or ASCS Commodity Office." The requesting office would specify the information desired, the service to be rendered, the form of report to be submitted, and the degree of urgency. Finally, an "amendment examination" is an examination made in connection with a change in the warehouse's license, for instance, adding or deleting a storage bunker to be covered by the license.

If an inspector noticed a deficiency in the warehouse's compliance with the licensing requirements that he believed should be corrected, he could issue the warehouse a Form WA-125, a "Memorandum of Adjustment." Supervisory personnel would then review the WA-125, together with the warehouseman's response to it, and decide whether and what further action is warranted.

The April 1 examination included a routine "subsequent" examination of Bird Grain's permanent storage facilities. This examination included a review of warehouse records and a physical inventory of the grain in stock. John Iten, the examiner, issued a Form WA-125 citing Bird Grain for four violations: deferred payment contracts that had not been signed by the grain producer; "show short positions" (storage obligations exceeded stocks) that occurred within the last year; a quality deficiency in corn inventory; and a quantity deficiency in soybean inventory.

Bird Grain's president and general manager, Dennis Bird, responded to the WA-125 form, addressing each item:

> Deferred payments contracts are from landlords whom [sic] live a long ways away. I will get the tenant to sign for them. All short positions were covered instantly as soon as we realized we were in a short position. I normally watch this very carefully so as to keep us out of a short position. All off grade Corn was replaced while examiner was here. Soybean inventories have been reduced as of date examiner left.

924 F. Supp. at 950.

John Lamborn, the supervisor in the Kansas City Commodities office, reviewed the WA-125 and Bird's response. He determined that the only serious deficiency in the group was the "show-short positions," which were past events that had already been corrected by the time of the April examination. The quality deficiency in corn was not a serious problem, because the deficit was less than one percent of Bird Grain's total stocks, and thus considered by the U.S.D.A. to be "operational", in other words, slippage that occurs in the normal course of business. The soybean deficiency was fixed during the examination by simply reducing the amount of "company-owned stocks," or soybeans the warehouse credited to its own account. Lamborn accepted Bird's explanation of the unsigned contracts and his plan to rectify the irregularity. Therefore, Lamborn did not schedule a follow-up examination for the main warehouse, but simply disposed of the WA-125 as "Next Exam will verify," which meant that the examiner would check that the conditions had really been corrected at the next "subsequent" examination.

Also during the April inspection, Iten conducted "special rollover" examinations of two temporary storage bunkers, XX and YY, which were about a mile away from the main warehouse, but were in use because of a grain surplus. It was necessary for the temporary bunkers to be relicensed yearly, and the special rollover examinations were required for relicensing. These bunkers accounted for 716,000 bushels of licensed space, and on April 1 actually held more than their licensed space: Bird Grain loaded 316,000 bushels of corn into XX in August of 1986, and 419,000 bushels of corn into YY in November 1986. Iten found deficiencies and issued WA-125s on each of the bunkers. Iten noted that "[t]he protective covering [on Bunker XX] has holes in it that need to be repaired." Iten also noted in Bunker XX "insects injurious to grain" and a "hard spot," which is a condition that indicates the grain is deteriorating. Iten concluded: "Continuation of the bunker as approved storage space would be contingent upon action taken to comply with WA-125 issued 4-1-88." Dennis Bird agreed to

remedy these problems.  Iten also issued a WA-125 for Bunker YY directing Bird Grain to repair the tarp covering the grain stored there.  Bird agreed to repair or replace the tarp.

Lamborn was satisfied with Bird's response and disposed of the WA-125s on the temporary bunkers as  "Next Exam will verify."  However, Steve Mikkelsen, of the Licensing Authority Branch, reviewed the WA-125s from the rollover examination without knowing of Dennis Bird's response or of Lamborn's disposition of the WA-125s.  Mikkelsen therefore caused the Warehouse Examination Division to conduct a special examination to check on the status of the WA-125s on the temporary bunkers. Iten conducted the special examination on August 5, 1988.  The examination was limited to the conditions noted in the previous WA-125s on the temporary bunkers; it did not extend to the conditions noted in the WA-125 for the subsequent examination covering the permanent warehouse and did not entail a physical inventory.  Iten's report on the special examination stated:

> Special examination completed to check compliance with WA-125 issued 4-1-88:
> Section XX has been emptied at this time.
> Section YY is in the process of being emptied (just started).  WA-125 issued to move to other approved storage space as tarp is in state of disrepair & heavy infestation of insects noted.  Corn stored here is still in good condition & would grade #2YC now.

Iten issued a new WA-125 requiring Bird to move the corn stored in YY.  The same day, at Bird's request, Iten conducted an amendment examination to delete the temporary storage bunkers as licensed storage space, which reduced Bird Grain's licensed storage capacity to 631,000 bushels.

The parties agree that after the April subsequent examination, Bird Grain started loading out grain without reducing obligations, and that by the end of May it had a

deficiency of 440,238 bushels.  By September the deficiency had hit a high of 475,689 bushels.

When the U.S.D.A. conducted the next subsequent examination in November 1988, the examiners discovered the huge grain deficiencies.  On November 18, the U.S.D.A. suspended Bird Grain's license.  The U.S.D.A. took over operation of the warehouse and liquidated the remaining inventories.  Appley Brothers sued, claiming that U.S.D.A.'s negligent inspection of the warehouse delayed the closing of the warehouse and damaged the depositors.

The district court granted the government's motion to dismiss for lack of jurisdiction, concluding the suit was barred by the discretionary function, 28 U.S.C. § 2680(a), and  misrepresentation, 28 U.S.C. § 2680(h), exceptions to the F.T.C.A.  This court reversed the dismissal, holding that neither exception applied.  Appley Brothers I, 7 F.3d at 721.   We held that the discretionary function exception did not apply, because the inspector conducting the August special examination had a mandatory duty to determine whether Bird Grain had corrected the grain shortages noted during the April subsequent examination.  We reasoned that a provision in the U.S.D.A. handbook required the inspector to issue a new "TW-125" if the old WA-125 had not been cleared, and since the inspector performing the August examination did not check for correction of the inventory shortages noted during the April subsequent examination, he breached that duty.  Id. at 723-26.

We remanded the case to the district court . The parties conducted additional discovery.  The government then moved for dismissal or summary judgment, arguing that the undisputed facts developed in discovery showed the claims were barred by the discretionary function exception.

The district court held that the "undisputed  evidence now paints an entirely different picture"  from the record before this court in Appley Brothers I, and that our

court "likely would not have ruled the same way had it had before it the facts now before this Court." 924 F. Supp. at 955. Under the facts now before the court, the purpose of the August special examination was limited to following up on the two WA-125's citing deficiencies in the temporary storage bunkers; it did not include a directive to follow up on grain shortages noted in the broader "subsequent" examination of the entire Bird Grain operation. Id. at 949, 955. Thus, contrary to our understanding of the facts in Appley Brothers I, Iten had no duty in the August special examination to check for correction of the grain shortages noted in the April subsequent examination. Nevertheless, the district court concluded that the discretionary function exception did not bar Appley Brothers' suit. The court concluded that the inspector violated a different mandatory directive, labeled "Deterioration and Out-of-Condition Grain." That directive provided that the "[r]eport must also be specific regarding quantities and locations (within the storage facilities) of out-of-condition commodities." The court held that Iten was required to investigate the "whereabouts or the condition of" the out-of-condition grain noted in the WA-125 on the temporary bunkers, and that if he had done so, it was "highly likely" that he would have discovered the massive grain shortages. Id. at 960.

Having decided that the suit was not barred by the discretionary function exception, the court considered whether the U.S.D.A.'s negligence would give rise to a cause of action under state law, which is incorporated as the standard for liability under the F.T.C.A. 924 F. Supp. at 961 (citing 28 U.S.C.A. §§ 1346(b), 2674). The court concluded that South Dakota law imposed a duty of care on the U.S.D.A. under the Good Samaritan doctrine. Id. at 962-63. The court held that a primary purpose of the Warehouse Act inspections was to protect the warehouse's depositors such as Appley Brothers, and that Appley Brothers relied on the U.S.D.A.'s inspections. Id. This would establish a Good Samaritan duty. Id.

Based on a stipulation as to damages, the court awarded $516,479.69 in damages to Appley Brothers. The government appeals.

# I.

The government argues that the new facts show Appley Brothers' claim is based on conduct protected by the discretionary function exception to the F.T.C.A. If a claim falls within the discretionary function exception, the court has no subject matter jurisdiction over the case. Dykstra v. United States, 140 F.3d 791, 795 (8th Cir. 1998). Since subject matter jurisdiction is a threshold consideration, "the district court has broader power to decide its own right to hear the case . . . ." Bellecourt v. United States, 994 F.2d 427, 430 (8th Cir. 1993) (quoting Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990)), cert. denied, 510 U.S. 1109 (1994). In determining its jurisdiction, a district court may make findings of fact, which we review for clear error. Bellecourt, 994 F.2d at 430. See Wessels, Arnold & Henderson v. National Med. Waste, Inc., 65 F.3d 1427, 1431 (8th Cir. 1995); Osborn, 918 F.2d at 729-30. However, in this case, both parties filed motions for summary judgment and agreed that the facts were undisputed. Likewise, the district court concluded that the material facts were not disputed and therefore did not purport to make findings of fact. 924 F. Supp. at 949. Accordingly, we review the record to determine "whether those facts are indeed undisputed." Osborn, 918 F.2d at 730. By contrast, we review the district court's application of the law de novo. Id.

The F.T.C.A. authorizes suits against the United States for damages:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting withing the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

This broad waiver of sovereign immunity is subject to the discretionary function

exception, which provides that the United States shall not be liable for:

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

Our initial inquiry then is "whether the challenged actions were . . . controlled by mandatory statutes or regulations" or whether they were discretionary in nature. United States v. Gaubert, 499 U.S. 315, 328 (1991). If the duty was mandatory, and if the government employee violated such a duty, the discretionary function exception will not provide immunity because there is no room for choice and no discretion involved. Id. at 324.

If the government employee's action was not governed by a mandatory duty, but involved an element of choice, we must then determine whether that judgment is of the kind that the discretionary function exception was designed to shield. See Berkovitz v. United States, 486 U.S. 531, 536 (1988). The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." United States v. Varig Airlines, 467 U.S. 797, 814 (1984).

The government argues that the district court erred in interpreting one section of the U.S.D.A. handbook to require an expanded search of the entire Bird Grain complex, whereas the special examination ordered was actually limited to the temporary bunkers. The government argues that finding a duty to track down the out-of-condition grain formerly in Bunker XX is contrary to the handbook's conception of a special examination and to the instructions Iten received from his superiors, and that it makes no sense in light of the realities of grain storage.

-10-

The district court generally recognized that Iten's marching orders for the August examination were quite circumscribed, and the court refused by and large to charge Iten with a duty to ascertain the overall health of the Bird Grain warehouse:

> Plaintiffs assert that "[e]ven a cursory visual inspection at the main facility would have uncovered the shortages." . . .
>
> Examiner Iten was not sent to Bird Grain to conduct a complete physical inventory. He had no reason to believe from Bird Grain's Daily Position Record that he should conduct a physical inventory.

924 F. Supp. at 959. However, the court concluded that one paragraph in the handbook section on special examinations did oblige Iten to go beyond reporting on the temporary bunkers, and that if he had obeyed that paragraph, it is highly likely he would have discovered the massive shortages. The district court based its holding on Part IV of the Grain Warehouse Examiner's Handbook, titled "Special Examinations," which states:

> Deterioration or Out-of-Condition Grain-- In making an examination of this nature [i.e., a special examination directed to out-of-condition grain], the examiner is primarily concerned with the commodity and condition specified in the assignment. However, he should not fail to report other obvious deficiencies noted during his examination. Examination reports on out-of-condition commodities should clearly describe the type and extent of damage involved and should assess the warehouseman's capability, or inability, to condition the commodity. The report must also be specific regarding quantities and locations (within the storage facilities) of out-of-condition commodities.

Id. at 959.

The district court held that this handbook provision constituted a mandatory regulation requiring Iten to determine Bird Grain's disposition of out-of-condition grain previously stored in section XX. Id. The court reasoned:

Iten's April 1, 1988, WA-125 regarding section XX, although not as specific as the handbook required, leaves no doubt that at least some of the corn stored in section XX was out-of-condition grain. . . . Iten could not simply ignore the fact that section XX, which had contained out-of-condition corn, was completely empty. In accordance with the instructions set out in the handbook, Iten had a responsibility to determine whether any of the out-of-condition corn from section XX remained "within the storage facilities." Storage facilities is plural, so at least inquiry should have been made to see if the 300,000 bushels of corn, or some part of it, was elsewhere in the storage facilities. Iten admits that he did not ask Dennis Bird what had happened to the corn in section XX or otherwise investigate whether any part of it was sold or remained within the elevator. . . .

> Through investigating the whereabouts or the condition of the more than 300,000 bushels of corn removed from section XX, it is highly likely that Iten would have discovered the massive shortages at Bird Grain.

Id. at 960 (citations omitted).

The government argues that all Iten was expected to do was inspect Bunker XX; once he learned that the corn had been moved from XX, he had only to report that Bunker XX was empty, which he did. The government states that Iten had no obligation to trace the whereabouts of the corn or conduct a physical inventory to determine if any of the corn remained within "the storage facilities." The government presented the affidavit of Supervisor Steven Mikkelsen stating that an attempt to trace the whereabouts of the corn after it had been moved from Bunker XX would be meaningless:

> Grain is a fungible product generally stored on a commingled basis . . . . Once grain is moved from one location to another, it effectively looses whatever "identity" it had while stored at a particular location.
> . . .
> Examiner Iten was not required to trace Bird Grain's disposition of the corn formerly in bunker XX. There are no requirements by statute, regulation or procedure for tracing the particular disposition of a

particular lot of grain.

The government also produced Lamborn's affidavit stating that Iten was not required to check on the disposition of the corn which had been previously stored in bunker XX. Lamborn explained that in many cases, merely moving the corn would recondition it, and that in other cases, mingling it with good condition corn would bring the mixture within the standards for number two yellow corn. Therefore, the government emphasizes that once the corn was moved, it may well have lost its status as "out-of-condition" or "deteriorating" corn, and the provision relied on by the district court did not apply.

The shortcoming of the government's argument, however, is that the district court did not say that the handbook required a physical tracing of the corn. Indeed, the court determined that the handbook required, at the very least, an inquiry as to the whereabouts of the corn. The statement in the handbook emphasizes: "The report must also be specific regarding quantities and locations (within the storage facilities) of out-of-condition commodities." The requirement that the report be specific in these respects establishes, at the very minimum, a duty to investigate. The direction to follow up on out-of-condition commodities is consistent with other provisions in the U.S.D.A. handbooks. The Handbook identifies one purpose of the special examination is to "check quality deterioration of stocks." The Grain Warehouse Examiner's Handbook requires the examiner "in all instances where a previously issued Form TW-125 [memorandum of adjustments] has not been completely cleared, . . . to issue a new Form TW-125 listing those conditions which remain uncorrected at the time of the special examination."

Had Iten conducted any investigation about the disposition of the previously reported deteriorating corn, the discretionary exception would likely protect Iten's decisions in conducting that investigation. Here, however, Iten conducted no investigation at all. The district court specifically stated: "Since Iten did not check or

inquire to see if any corn from XX remained in the elevator or storage facilities he, of course, did nothing to see if the out-of-condition corn had been reconditioned, or if it had deteriorated further." 924 F. Supp. at 960.

Our reasoning also disposes of the government's argument that even if the handbook required some follow-up investigation as to the whereabouts of the corn, the discretionary function exception bars this suit because the handbook does not clearly and specifically define what Iten was supposed to do. The government points out that this court has consistently required that the regulation at issue dictate a specific course of conduct in order for the conduct to rise to the level of a mandatory duty. See, e.g., McMichael v. United States, 856 F.2d 1026, 1033 (8th Cir. 1988) (evacuation if lightning); cf. C.R.S. v. United States, 11 F.3d 791, 799 (8th Cir. 1993) (agency guidelines suggest that those charged with policy's implementation retained wide latitude regarding its execution).

In Tracor/MBA, Inc. v. United States, 933 F.2d 663 (8th Cir. 1991), we held that the government had discretion in conducting a safety inspection. We reasoned that the inspection was similar to the inspection in Varig Airlines, in that the safety checklist did not prescribe a course of action for the inspector to follow in checking compliance or taking action should a problem exist. Here, although the inspector had discretion in selecting how he would investigate the status of previously reported out-of-condition grain, he had no discretion not to undertake some investigation. Cf. also Deuser v. Vecera, 139 F.3d 1190, 1194-95 (8th Cir. 1998) (no policy set forth for terminating an arrest). It is undisputed that Iten did nothing to investigate the condition or whereabouts of the previously reported out-of-condition corn, as he was required to do by the manual. Thus, this case is much closer to McMichael than Tracor. See McMichael, 856 F.2d at 1030-34.

Likewise, the First Circuit recently determined that the discretionary function exception foreclosed a claim based on a negligent OSHA inspection in Irving v. United

<u>States</u>, No. 96-2368, 1998 WL 869672, at *6-15 (1st Cir. Dec. 18, 1998).  The court concluded that the OSHA inspection did not require the inspectors to examine every machine in a plant and was akin to the  "spot check" inspection process, "squarely within the <u>Varig Airlines</u> regime."  <u>Id.</u> at *12-13.  <u>Irving</u> differs from our case in that the <u>Irving</u> plaintiff complained about the negligent way the OSHA inspectors conducted their inspection.  Here, the Appley Brothers' complaint centers on a lack of investigation required by a mandatory U.S.D.A. directive.

Mikkelsen's statement that there are no requirements by statute, regulation, or procedure for tracing the disposition of the corn does not create a genuine factual issue as to whether Iten had a mandatory duty to investigate the whereabouts of the corn.  We recognize that when a government agency has administrative authority over a regulation or procedure, we are obliged to accord great deference to the agency's reasonable interpretation thereof.  <u>See</u> <u>Chevron, U.S.A., Inc. v. Natural Resource Defense Council, Inc.</u>, 467 U.S. 837, 844-45  (1983).  Here, however, Mikkelsen's statement is directly contrary to the plain language of the handbook.  His statement does not create a genuine issue of fact as to the nature of the duty imposed by the handbook.   <u>See</u> <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414 (1945) (administrative interpretation is controlling unless "plainly erroneous or inconsistent with the regulation").   The "Deterioration or Out-of-Condition Grain" provision permitted the district court to conclude that the USDA inspector had no discretion to make an independent policy judgment as to whether he should check on the status of previously reported out-of-condition grain.

Because there was no mandatory directive to physically trace the corn, the government contends that the discretionary function exception cannot apply, as any discovery of the shortfall would have been purely coincidental.  The government, however, does not contest the fact that at the time of the August 5 inspection, the warehouse was short 358,011 bushels of corn, representing 43% of the warehouse's outstanding obligations.

The government's argument that merely asking about the whereabouts of the corn would not have led to the discrepancy is speculative, as Iten made no inquiry. The government's theory simply does not diminish the district court's statement that had Iten investigated the whereabouts or the condition of the more than 300,000 bushels of corn removed from XX, it is highly likely he would have discovered the massive shortages of grain. See 924 F. Supp. at 960. If this statement of the district court strays into an area beyond that of undisputed facts, and perhaps it does, then our standard of review permits us to decide whether such a finding is clearly erroneous. See Bellecourt, 994 F.2d at 1431 (disputed factual findings used to determine jurisdiction reviewed under clearly erroneous standard); Wessels, Arnold & Henderson, 65 F.3d at 1431 . As stated, the record establishes that Bird Grain began clearing out the storage facilities shortly after the April 1 inspection, and that on August 5 the facility was short over 350,000 bushels of corn, close to half of its total obligations. Thus, the determination that a reasonable inspection would have led to discover the massive grain shortages is supported by undisputed facts in the record and is not clearly erroneous. See United States v. United States Gypsum Co., 333 U.S. 364, 394 (1948) (inferences drawn from documents or undisputed facts should not be set aside unless they are clearly erroneous). Accordingly, the district court correctly concluded that Iten had a mandatory duty to investigate the status of the corn noted during the August 5 inspection. The discretionary function exception does not bar this claim.

## II.

Under the Federal Tort Claims Act, the United States is only liable when "a private person[] would be liable to the claimant in accordance with the law of the place: where the allegedly tortious act or omission occurred." 28 U.S.C. § 1346(b)(1). The district court determined that the U.S.D.A. had a common law duty under the "Good Samaritan" doctrine. South Dakota courts, following the Restatement (Second) of Torts § 324A, have recognized that:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Schoenwald v. Farmers Co-op. Ass'n, 474 N.W.2d 519, 521-22 (S.D. 1991).

The government first argues that no duty was imposed under the Good Samaritan doctrine because the U.S.D.A. did not perform a "direct service to particular persons." The government argues that the U.S.D.A.'s mandate under the Warehouse Act is to facilitate interstate commerce in agricultural goods by establishing uniform standards for federally-licensed warehouses, and that the U.S.D.A. did not undertake to render a service to the farmers which was "necessary" for their protection. The government contends that the U.S.D.A.'s actions were undertaken to further regulatory goals, and that the farmers who stored grain at the federally licensed warehouses were only incidental beneficiaries of the U.S.D.A.'s enforcement activities.

In Schoenwald, the South Dakota Supreme Court affirmed a finding that an insurance company which performed an inspection of its insured had no duty under § 324A of the Restatement to perform the inspection non-negligently. 474 N.W.2d at 521-22. The court reasoned that the insurance company did not undertake to perform a duty of providing a safe work environment. Id. at 522. "Merely because an individual or a company performs an inspection does not, in and of itself, create an

-17-

obligation to perform such inspection in a non-negligent manner." Id. at 520.  Central to this conclusion was evidence that the insured had no expectation that the insurer performed the inspection for its benefit.  Id. at 522. Benefit to the insured from the insurer's inspections by way of comment of observations on safety problems does not establish an intent to perform a duty of providing a safe working environment on behalf of the insured.  See id.; accord Schultz v. Mills Mut. Ins. Group, 474 N.W.2d 522, 526 (S.D. 1991).

By contrast, the U.S.D.A. inspections were for the purpose of protecting the interests of the farmers who stored grain at Bird Grain.  That purpose is set forth in the Warehouse Examiner's Handbook:

> to protect the interests of depositors and their pledgees.  In examining a federally-licensed warehouse, we represent the interest of a great many depositors and holders of federal warehouse receipts. . . .

The Handbook explains:

> An individual depositor, other than the Commodity Credit Corporation, cannot ordinarily make the kind of tests or examinations necessary to assure himself that a warehouse operation as a whole is sound and solvent.  He lacks the authority, the means, and the knowledge required to make a complete examination, and without a complete examination, he cannot be certain that his interests are fully protected.

Legislative history related to the Warehouse Act specifically discusses examinations at licensed warehouses:

> The information developed is of primary benefit to sellers and depositors, the owners of stored inventory, who individually are not in a position to determine whether their interests are being properly safeguarded.

Senate Comm. on Agriculture, Nutrition, and Forestry, Legislative History of the

Omnibus Budget Reconciliation Act of 1981, S. Rep. No. 97-35, at 42 (1981), reprinted in 1981 U.S.C.C.A.N. 396, 432. More recent amendments to the Warehouse Act and its supporting regulations emphasize that one of the objectives of the Warehouse Act is to protect producers and others who store their property in public warehouses. Cotton Warehouses; Definitions, Financial statement, Bonding and Net Asset Requirements, Warehouse Bonds and Transfer of Stored Cotton, 53 Fed. Reg. 27,147, 27,148 (1988) (amending regulations at 7 C.F.R. Part 735). Thus, the reason for the warehouse inspections makes clear that the U.S.D.A. did "undertake to render a service" which was "necessary" for the protection of those who stored grain at Bird Grain.

We also reject the government's argument that plaintiffs did not detrimentally rely on the U.S.D.A.'s August 5 special examination. The government points out that under the Act, the warehouseman bears the responsibility for complying with the Act and its regulations and U.S.D.A. inspections do not relieve the warehouseman of this responsibility. The government further argues that merely knowing that Bird Grain was a federally-licensed warehouse is insufficient to prove reliance on the U.S.D.A. inspection.

In Dorking Genetics v. United States, 76 F.3d 1261 (2d Cir. 1996), the Second Circuit held that certain cattle buyers could not prove reliance on the United States's negligent inspection of cattle. Id. at 1268. In that case, a foreign cattle buyer asserted that the United States had a duty to the Zimbabwean government to prohibit the export of cattle which did not meet the country's health requirements. Id. at 1267. The Second Circuit disagreed, pointing out that Zimbabwe did not dispense with its own inspection program in reliance on the United States' prohibition of the export of infected cattle. Id. at 1268. The reason for the inspection in Dorking Genetics was different from the reason for the inspection procedure here. The testimony of the plaintiffs who stored grain at the warehouse, as well as the evidence about the purposes underlying the Warehouse Act, show that the farmers did not and could not perform their own

inspections of Bird Grain, and that they reasonably relied on the U.S.D.A. inspection process. Cf. Florida Auto Auction v. United States, 74 F.3d 498, 505 (4th Cir. 1996) (no evidence that automobile auctioneers relied on customs officials to enforce regulation requiring presentation of certificates of title before allowing the exportation of automobiles); Myers v. United States, 17 F.3d 890, 904 (6th Cir. 1994) (primary responsibility for mine safety lay with mine owners and miners; injured miners could not reasonably rely on inspection by Mine Safety and Health Administration). We are therefore persuaded that if the United States were a private person, it would be liable to Appley Brothers under South Dakota law.

We affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.